# Rice v. Kentucky Utilities Co.

Oct. 31, 1941.

William Rice and G. G. Rawlings for appellant.

T. M. Galphin, Jr., and Roy W. House for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

On September 1, 1937, appellant, a lineman of the Northeastern Telephone Company, was injured by touching a telephone wire said to have been supercharged by contact with appellee's wire. He did not make his employer a party, but joined as defendant the McGlone Construction Company then doing road work in Clay County, alleging that its employees had caused the contact of the two sets of wires. We shall refer to the companies respectively as power, telephone and construction.

The appeal presents one question: Did the lower court erroneously instruct the jury at the close of appellant's evidence to find for the power company? The construction company answered without waiving motion to quash the summons against it; this motion was sustained and the case proceeded against the power company. There is no cross appeal.

The petition specifically charges that the construction company "so negligently operated a steam shovel over a roadway as to cause part of it to come in contact with the wires of the telephone company," which in turn contacted the highly charged wires of the power company, whereby the telephone company's wires became heavily charged; that plaintiff who was at work at the time on telephone wires received a severe shock.

It is then charged that the power company negligently operated and maintained its wires and poles in such a dangerous manner as to cause the telephone wires to become charged with high and dangerous voltage, "all of which negligence, jointly and severally, was the direct and proximate cause of plaintiff's injuries." Plaintiff asserts that he did not know of the dangerous position in which he had been placed, in time to have avoided injury, but that defendants could have so known by the use of ordinary care. Plaintiff sought to recover of defendants $1,000 for loss of time and $25,000 for physical pain, suffering and anguish. The power company answered, denying material allegations in so far as the petition charged it with negligent maintenance and operation, and plead contributory negligence.

The controlling question is as stated above, and we find little or no dispute as to facts. As to physical situations, (not too clearly detailed), we gather that the telephone company had first erected its poles and wires. The telephone exchange is in Manchester, and serves Clay County and a few adjoining counties. The power station nearest Manchester and point of wire contact, is at London; this is a sub-station, the power coming from a main station at Pineville, supplying Manchester, some coal mines and other operations.

The telephone and power poles were located on one side of a roadway near Manchester, and ran parallel with the road for a distance. Both were built on a slight elevation; the distance from the road is not given, but the telephone poles were 6 to 8 feet further from the road than the power poles. The telephone company's lines came from its exchange in Manchester across a creek, which ran parallel with the road and were attached to one of its poles. The telephone company in order to serve a grocery company and an oil station had run a line down (or up) the road the length of one span

which was attached to another pole parallel with the other poles. This line dropped down the service pole 5 or 6 feet, thence at right angle and below power wires, across the road to the station and grocery. The power wires were strung about 18 to 22 feet from the ground. The height of poles is not given. The evidence fails to show how high from the ground the telephone wire was at the point where it crossed the road.

The contact of the wires occurred in the following manner: The construction company was moving a steam shovel along the road where the service wires crossed the roadway. In some manner the boom of the steam shovel, or some appliance used to raise the wire to permit the passage of the shovel, came in contact with the wire with force enough to break the pole. The pole and the attached wire fell across the power wires. The power wires were not broken, and the proof is not clear as to whether or not a telephone wire was broken. One witness who came upon the scene later says he cut the telephone wire.

Rice was on a pole of the telephone company at 2:35 p. m., on a line running from Manchester to Burning Springs, the pole being twelve miles from Manchester. The telephone wires upon which Rice was working carried about 90 volts, and were not wires which came in contact with the power wires. The voltage from the power wires could only be carried to the wires upon which Rice was working through the Manchester switchboard. The proof shows that each wire coming into the exchange was connected to a fuse before it entered the switchboard; the rack or frame holding the fuse and wires was connected with a high voltage protector, and a ground wire located at the rear of the exchange.

The operator who was in charge of the board on the day of the contact says that she heard a loud noise, and all the metal drops on the board fell, which occurs (singly) when a call comes in. There was no cessation of telephone communication, except on the lines running to the station and grocery. At the time of the contact there was no plug in the switchboard.

Rice testified that he had climbed a pole; had partly completed a splice and reached out to take hold of another wire. One wire was "across his breast," and when he touched this one he received a shock. He says,

"It held, I don't know right along to half a minute."
He had on his safety belt and climbing spurs.  He says
he was unconscious for a few minutes and did not know
how he got down the pole, though he said later that he
came down by means of his climbers.  He walked to a
point in the road where a fellow employee was working;
they got in the car and Rice drove to Manchester, went
to the exchange to learn what had happened, and to a
physician who gave him some medicine and told him
to go home and remain quiet.

Describing his condition following the shock, he
said he had a swelling in his chest, pains in his back
and head; his eyes burned and his hearing was not
good.  His tongue and throat were swollen and white
for some time after the shock.  He went to bed follow-
ing the injury and there remained for about four weeks,
"when he got better," but later has suffered some pain
in his eyes and back, and his hearing was not as good
as before the shock.  The proof indicates that appellant
drew his regular wage during the time he was laid up,
and that he went back to work some time in October.

Dr. Anderson treated him following the shock.  He
said the "chances were" that he told him to go home
and be quiet.  He found Rice suffering more or less
from shock, "muscular and nervous pain and head-
ache."  He treated appellant for three or four weeks.
He had pains in his chest, right arm and head; his right
eye was congested and pained him.  His tongue was nor-
mal as to color, but Rice complained of it feeling "thick
and numb."  Dr. Anderson had not examined Rice "for
a long time."  He nowhere said that appellant was
incapacitated from work, or suffering at the time of
trial, two years after injury, though appellant then
complained of some physical pains.

Appellant introduced no evidence in attempting to
show negligence (beyond physical situations) on the
part of the power company, except that of Stinson, its
manager, who at the time had supervision of the line
leading from London sub-station to Manchester.  He
testified that when the contact came between the wires
near Manchester, the fuse at London blew out; the
effect was to de-energize the Manchester line, which he
explained "cut all electricity of the line."  He said the
power wires, four in number, were about the size of a
pencil.  They were not insulated; two or three of the

wires carried 11,000 volts, but from the "hot" wires to the dead wires about half that voltage. If the telephone wire should touch one of the power wires it would have a tendency to transfer one-half the voltage to the telephone wire which touched the line. He said that if the contact was made with a wire carrying one-half the voltage it would be "dangerous to human life." If the current stayed on the telephone wire long enough it would likely burn it through.

Witness did not know the height of the poles at point of contact; they varied from 30 to 50 feet. His fuses and grounds and all equipment were at the time in good working order. He further said that it was impracticable to insulate wires carrying voltage as high as 6,500, and he knew of no place where such wires were insulated.

Appellant strenuously contends that his proof was sufficient to pass the case to the jury, it being urged that the power company was grossly negligent in placing its poles parallel with the telephone poles, and in such close proximity thereto as "that the telephone lines would likely come in contact with the power wires," which were not insulated. Further that the power company knew, or could have known, that the telephone wires across the road were so low that some object moving along the road was likely to interfere with the telephone wires in such a way as to cause contact and create a dangerous situation.

In this argument appellant rightfully asserts that in erecting such instrumentalities as high voltage power lines, one is charged with the exercise of more than ordinary care. McLaughlin v. Louisville Electric Co., 100 Ky. 173, 37 S. W. 851, 34 L. R. A. 812. This case relied upon by appellant, states the universal rule mentioned, but has no further application, since the facts are so widely divergent. The recitation of the evidence of the manager of the power company as to installation and maintenance of equipment evinces no negligence in these particulars, and appellant relied on this as a part of his evidence to show negligence.

The case before us boils down to the question as to whether or not the power company, in constructing and maintaining its poles and wires in the manner described, was guilty of such negligence as would make it liable

for the injury claimed; or to narrow it still closer, was. such maintenance the proximate cause of the injury? It must be remembered that the telephone company had erected and maintained the wire across the road which contacted the wires of the power company. The maintenance in this manner might be held, facts justifying such holding, to be joint or several negligence. But in the case before us, since it is alleged in an uncertain way that the joint negligence was the proximate and direct cause of the injury, it became incumbent on plaintiff to show that the maintenance of appellee's wires and poles. was the proximate cause of the injury.

Counsel undertakes to establish his right by contending that the power company should have anticipated that some sort of machinery moving over the road would. come in contact with the wire of the telephone company with such force as to break a telephone pole, and following the breakage the telephone wires contact the wires of the power company, and carry the voltage for twelve miles. In addition to the McLaughlin case, supra, counsel relies somewhat upon the cases of Lexington Ry. Co. v. Fain's Adm'r., 71 S. W. 628, 24 Ky. Law Rep. 1443; Kentucky-Tennessee L. & P. Co. v. Priest's Adm'r, 277 Ky. 700, 127 S. W. (2d) 616. These cases would be persuasive if the facts upon which conclusions are based were similar to the facts in the instant case.

Without undertaking to analyze the proof in those cases wherein we held negligence, it may be said that in all of them the negligence (proximate cause) was faulty construction in the distribution system. In most of them it appeared there was a defective insulated wire or wires, at a place where a person had a right, or was reasonably expected, to be and where contact could be easily accomplished, and that the injured person relied upon perfect construction, i. e., proper insulation.

It is true in the Priest case, supra, the injury to Priest was the result of moving a steam shovel under a temporarily erected wire carrying high voltage. Priest in undertaking to raise the wires, after climbing up the steel boom reached up to lift it over the boom and met the injury. The proof developed the fact that the wires in temporary use were old and worn and at a place where they were spliced there was no insulation at all,.

to which defect Priest had called the lineman's attention. The similarity in that and the case before us is the fact that a wire was being raised to permit a steam shovel to pass under. We held that one engaged in the distribution of electricity must take cognizance of the probability of danger, and where there is a defect in the distributive system which might cause injury to a person who is in a place where he has a right to be, failure to remedy the defect will constitute negligence.

In the recent case of Morton's Adm'r v. Kentucky-Tennessee L. & P. Co., 282 Ky. 174, 138 S. W. (2d) 345, we reaffirmed the principles laid down in the cases, supra, and said in elaboration, "thus a distribution of electricity whose system was defectively constructed or unsafe through faulty insulation is not excused from liability to one injured thereby on the idea that he could not foresee that the injured person would do the particular thing he did do, for the distributor is charged with knowledge that the condition he created was calculated to deceive a person who had the right to act upon the assumption that the system was safe." The facts in the instant case are similar to facts in the case of Kentucky Utilities Co. v. Searcy, 167 Ky. 840, 181 S. W. 602, upon which we based the ruling in the Morton case and in which distinguishing these from the cases relied upon by appellant, we said:

"The distinction in principle is that in those cases the injury was produced by the negligence complained of—the proximate cause—although it may not have been foreseen, while in others the act of the defendant, alleged to be or actually negligent, indirectly or remotely caused the result, and for such to constitute actionable wrong the accident must have been foreseen or anticipated in the light of the attendant circumstances. Nunan v. Bennett, 184 Ky. 591, 212 S. W. 570. Where no danger exists in a condition which merely made it possible for an injury to happen through some independent, unrelated and efficient cause, the condition cannot be held as the proximate cause. Collins' Adm'r v. Chesapeake & O. Railway Co., 276 Ky. 659, 124 S. W. (2d) 1039; Newton v. Weatherby's Adm'r, 287 Ky. 400, 150 S. W. (2d) 947. Under this general law, even with the high degree of care imposed upon distributors of electricity, they are not re-

quired to guard against that which a reasonably prudent person under the circumstances would not anticipate as likely to happen; thus they are not required to insulate wires at points where no one could reasonably be expected to come in contact with them. Watral's Adm'r v. Appalachian Power Co., supra [273 Ky. 25, 115 S. W. (2d) 372]; Frederick's Adm'r v. Kentucky Utilities Co., 276 Ky. 13, 122 S. W. (2d) 1000.''

To the same effect, in so far as principle is concerned, and wherein the facts justified the application of the principle and the liability of the distributor of power, reference may be had to Moran's Adm'x v. Kentucky Power Co., 228 Ky. 329, 14 S. W. (2d) 1087; Kentucky Utilities Co. v. Woodrum Adm'r, 224 Ky. 33, 5 S. W. (2d) 283, 57 A. L. R. 1054. While it did not get to the jury, because of the fact that the construction company passed out of the case, there is testimony that one of its servants who undertook by means of a hand pole to raise the wires, caused the sustaining pole to break off because it was rotten at the base.

As we read the opinion of the trial judge it is clear that he found the telephone company's faulty maintenance, and the act of McGlone's servants to have been the proximate cause, and that appellant had failed in his effort to show negligence on the part of the power company. We are of the opinion that his holding was correct.

Judgment affirmed.