## Dixon v. Kentucky Utilities Co.

May 14, 1943.

William Lewis & Son for appellant.

Ogden, Galphin, Tarrant & Street and William A. Hamm for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

Appellant's decedent, an eleven year old girl, was electrocuted as the result of her hands having come in contact with a wire fence which had become charged with electricity from a wire transmitting electric current from appellee's distribution plant in East London, Kentucky, to transformers. The accident occurred a few minutes after a motorist, endeavoring to escape the police, had driven off the highway and struck and broken a pole carrying the charged wire, causing it to tilt or lean in such a manner as to bring the wire into contact with a barbed wire constituting the top strand of the fence. The decedent who lived nearby was stamping out a fire, in the dry grass, resulting from the collision when she inadvertently took hold of the fence; and it is not contended that sufficient time had elapsed between the dislodgment of the pole and decedent's contact with the charged fence to have enabled the appellee to have removed the hazard created by the lowered wire. It is contended, however, that the appellee was negligent during many months immediately preceding the accident in permitting the wire carrying the heavy voltage to sag to within three feet of the barbed wire between the pole in question and the pole next in line, where the contact between the wires occurred; and one witness for appellant gave it as his opinion that had the wire not been permitted to sag to the extent indicated, the breaking of the pole and its subsequent change in position would not have lowered the wire sufficiently to have brought about its contact with the barbed wire. It should here be noted that, although a large piece was broken out of it at its base, the pole, instead of falling, was carried by the impact of the automobile to a point beyond and above the gulley in which it had been originally planted, and, supported by the wires maintained a leaning position. Some of the testimony

introduced by appellant indicated that the pole had leaned slightly for some time prior to the collision, and because a cut-out in the service wire with which the wire in question connected did not operate to degenerize the latter when it came into contact with the barbed wire, it is suggested that there was some evidence of defective appliances or defective equipment. But the failure of the fuse cut-out was thoroughly explained by the fact that there was not a sufficient contact or "ground" between the wire fence, which was attached to locust posts, and the earth, to permit enough current to flow and bring about an overload, and there was no evidence introduced by appellant that either the particular fuse cut-out referred to or those located at the sub-station, or any of appellee's equipment, was in anywise defective or insufficient. On the contrary, the evidence showed that the equipment was modern and of the proper design, and, although appellant's brief contains the suggestion above referred to relative to the failure of the fuse cut-out in the main wire to operate, it also contains this statement:

> "What the plaintiff is complaining of in this case is that the defendant, Company, was negligent in permitting one of its power poles, near the intersection of Can Street with Dixie Highway No. 25, south of London, being out of line and leaning and out of repair, and that it had been for many months next before the accident in that condition, and that the defendant knew about its condition, or could have known it by the exercise of any degree of care, and the plaintiff is complaining that the defendant, Company, with gross carelessness and negligence, suffered and permitted one of its high tension wires, charged with a high and dangerous current of electricity, connected with this leaning pole and extending east out Can Street, and connected with another one of its power poles also, for many months next before the accident to greatly sag and get out of repair and in a dangerous condition, sagging down over the top of a woven wire and barb wire fence, and over which the power line had been erected, and that often times this high tension wire was sagged down within a few feet of the top of that wire fence."

It was charged in the petition that the death of appellant's decedent was due to the concurrent gross negli-

gence of the appellee and the motorist who collided with the pole. The defense was that the decedent's death was due solely to the negligence of the motorist. In view of the fact that there was evidence indicating that the appellee had not used ordinary care to prevent the wire in question from sagging, and that the pole had leaned to some extent prior to the accident, the Trial Court, since it peremptorily instructed the jury to find a verdict for the appellee, obviously concluded that though appellee might have been negligent in the particulars claimed by appellant, such negligence was not a proximate cause of decedent's death. On this appeal from the judgment rendered on that verdict, we shall assume the truth of appellant's testimony respecting the sagging of the wire and the leaning of the pole, although it was vigorously disputed, and indulge the theory, the correctness of which was not established by the proof, that had the wire not been permitted to sag, the breaking and dislodgment of the pole would not have caused the wire to come into contact with the barbed wire, and determine appellee's legal responsibility for the fatality in the light of these assumptions and indulgences. Hence, it only remains to be determined whether the sagging of the wire and the leaning of the pole constituted a concurring proximate cause imposing liability, or a remote cause for which no liability attaches.

To constitute a "proximate cause" of an injury, the negligence complained of need not be the direct or immediate cause, but it must do more, unless the injurious result is foreseeable, than merely furnish the condition or give rise to the occasion by which the injury was made possible. If it is not the immediate or direct cause but requires the intervention of an immediate or direct cause to bring about the result, it is regarded as a "concurring proximate cause" imposing liability upon those responsible for it only when the intervention of the immediate cause and the resulting injury could or should have been foreseen in the light of the circumstances. As said by Professor Joseph H. Beale in his admirable treatise, "The Proximate Consequences of an Act," 33 Harvard Law Review 633:

> "If the defendant's active force has come to rest, but in a dangerous position, creating a new or increasing an existing risk of loss, and the foreseen danger comes to pass, operating harmfully on the

condition created by defendant and causing the risked loss, we say that the injury thereby created is a proximate consequence of the defendant's act. * * *

"On the other hand, when defendant's active force has come to rest in a position of apparent safety, the Court will follow it no longer; if some new force later combines with this condition to create harm, the result is remote from defendant's act. * * *

"The form of rule above stated is believed really to state the true distinction, and the one actually enforced by the Courts. The wording of it, however, is not that ordinarily used. The commonest phrase, probably, is that the injury should be the natural and probable result of the act, a phrase which involves at least a misuse of both adjectives. A more accurate phrase, which is gaining in use, is that the intervening force, unless it is to make the result remote, must be foreseeable."

In the case of Seith v. Commonwealth Electric Co., 241 Ill. 252, 89 N. E. 425, 427, 24 L. R. A., N. S., 978, 132 Am. St. Rep. 204, the rule is thus stated:

" 'To constitute proximate cause the injury must be the natural and probable consequence of the negligence, and be of such a character as an ordinarily prudent person ought to have foreseen might probably occur as a result of the negligence. It is not necessary that the person guilty of a negligent act or omission might have foreseen the precise form of the injury; but, when it occurs it must appear that it was a natural and probable consequence of his negligence. If the negligence does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent independent act of a third person, the two are not concurrent, and the existence of the condition is not the proximate cause of the injury. Where the intervening cause is set in operation by the original negligence, such negligence is still the proximate cause, and where the circumstances are such that the injurious consequences might have been foreseen as likely to result from the first negligent act or omission, the act of the third person will not excuse the first wrongdoer. When the act of a third person intervenes, which is not a consequence of the first

wrongful act or omission, and which could not have been foreseen by the exercise of reasonable diligence, and without which the injurious consequence could not have happened, the first act or omission is not the proximate cause of the injury. The test is whether the party guilty of the first act or omission might reasonably have anticipated the intervening cause as a natural and probable consequence of his own negligence, and, if so, the connection is not broken; but if the act of a third person, which is the immediate cause of the injury, is such as in the exercise of reasonable diligence would not be anticipated, and the third person is not under the control of the one guilty of the first act or omission, the connection is broken, and the first act or omission is not the proximate cause of the injury.' ''

In Nunan v. Bennett et al., 184 Ky. 591, 212 S. W. 570, 572, this Court said:

"Some courts deny that the injury in order to be the proximate result of the negligence 'ought to have been foreseen in the light of the attending circumstances' as contained in the above quotation [from Milwaukee & St. P. R. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256] but most of the courts, including our own, incorporate that element in the definition. The confusion seems to have grown out of the failure to distinguish between an injury directly produced by the negligence complained of and one which is indirectly or remotely produced. If the injury is the direct result of the alleged negligence, the latter may be said in all cases to be the proximate cause of the injury, although it may not have been foreseen in the light of the attending circumstances. If, however, the injury is only the indirect or remote result of the alleged negligence, then it must have been foreseen or anticipated in the light of the circumstances.''

See also Watson v. Kentucky & Indiana Bridge & R. Co. et al., 137 Ky. 619, 126 S. W. 146, 129 S. W. 341; Flummer's Adm'r v. Tri-State Tel. Co. et al., 186 Ky. 84, 216 S. W. 133; Cundiff v. City of Owensboro, 193 Ky. 168, 235 S. W. 15; Louisville Auto Supply Co. v. Irvine, 212 Ky. 60, 278 S. W. 149; Riley v. Louisville & N. R. Co., 231 Ky. 564, 21 S. W. (2d) 990; Fiechter v. City of Corbin, 254 Ky. 178, 71 S. W. (2d) 423; Suter's Adm'r v.

Kentucky Power & Light Co., 256 Ky. 356, 76 S. W. (2d) 29; Rice v. Kentucky Utilities Co., 288 Ky. 170, 155 S. W. (2d) 760; Salt River Water Users' Ass'n v. Cornum, 49 Ariz. 1, 63 P. (2d) 639; Indiana Service Corporation v. Johnston, 109 Ind. App. 204, 34 N. E. (2d) 157, 158. In the last cited case the petition alleged that the plaintiff, Johnston, was injured by an electric light pole falling upon him. The pole was caused to fall by the falling of another pole 150 feet distant into which a motorist had negligently driven his automobile. The two poles were connected by wires, and the one which fell was unsupported by brace wires, and had become decayed and rotten. Holding that the rotten condition of the pole was not the proximate cause of the accident, but that the proximate cause was the independent intervening act of the motorist in driving his car into the pole, the Court said:

"An essential element of proximate cause is the requirement that the result must be such as might reasonably have been anticipated in the ordinary experience of men. In applying this rule to a case like the instant one, wherein the alleged negligence merely created a condition by which the injury was made possible and the subsequent independent act of an intervening agency caused the injury, logic requires not only that the type of injury should have been reasonably anticipated but that the intervention of the independent agency should have been anticipated. * * *

"Our inquiry in the instant case may well be directed then to the question as to whether appellant should have anticipated that the driver of an automobile would negligently drive his car off the traveled portion of the highway over the curb and into one of its poles with sufficient force to affect a connecting pole 150 feet away. The inquiry is self-answering. In this day when the streets and highways are being constantly used by automobiles, tractors and trucks of great weight and power, it would be unreasonable indeed to hold that companies maintaining poles adjoining the streets and highways must maintain their poles not only in such condition as to be safe in regard to ordinary hazards, but also in such condition as to resist the weight and force of any cars, tractors or trucks which might be negli-

gently driven off the highway and into them. They are neither bound by duty to so maintain their property, nor are such acts on the part of the drivers of vehicles reasonably to be anticipated.

"It follows that the alleged negligence of appellant was not the proximate cause of the injuries complained of and its demurrer should have been sustained."

In the case at Bar, since it is obvious that the negligence of the motorist in colliding with the pole was the immediate and direct cause of the death of appellant's decedent, even though we assume that appellee was negligent in permitting the pole to lean and the wire to sag in the manner claimed by appellant, it only remains to be determined whether appellee should have foreseen the likelihood of the pole being struck by an automobile, and anticipated the possible consequences. Thus it becomes necessary to examine with some particularity the situation of the poles and wire with reference to their surroundings.

The pole with which the motorist collided was cut from Western red cedar, was 40 feet in length, and imbedded to a depth of approximately 5 feet in a ditch 3½ feet deep, outside of the corporate limits of London at a point 17 feet east of the traveled portion of U. S. Highway 25, and 8 feet from the outer shoulder. The point of its location was also 17 feet from the nearest edge of Can Street, which extended eastwardly from the highway. The main line of appellee's distribution system extended from the sub-station in East London along the highway southwardly toward Corbin, and consisted of four wires, one of which was a neutral or ground wire; and a branch circuit consisting of an energized wire and a neutral wire extended from this pole along and at some distance from the south side of Can Street to a transformer where the current was reduced for service to a few residents on that street. These branch wires were attached to a buck-arm 3 feet beneath the cross arm supporting the main wires on this corner pole, and were dead-ended on insulators on the buck-arm, but the energized wire, the one which came in contact with the barbed wire following the collision, received its current from a wire connecting it with one of the three above mentioned energized wires on the main line on the cross arm above. Eight feet below this buck-arm, two telephone wires of

the Northeastern Telephone Company were attached to a cross arm on the pole and extended along Can Street underneath and parallel, most of the way, with the wires of appellee. Appellee's wires, when they left this pole going eastwardly with Can Street, were 29 feet above the level of the surrounding ground and street, and the telephone wire was 8 feet lower. The next pole on Can Street to which appellee's wires were attached was 190 feet distant, and this pole had a height of thirty feet above the ground. Appellee's wires were attached to that pole on a cross arm about 3 feet from the top. The telephone wires were attached to a pole of the Telephone Company just beyond and close to this pole of the appellee. Between the two poles belonging to appellee there was a rise in the ground of 3½ feet, and the wires thus strung, if they had been absolutely tight without any natural sagging whatsoever, would have been approximately 25 feet above this rise in the ground. The wire fence bordered on the south side of Can Street from a beginning point 56 feet eastwardly from the corner pole, and was composed of mesh or woven wire with an estimated height of 3½ feet. The barbed wire which topped it did not contact the mesh wire in the span between the corner and the next pole, but did touch it in the next span. Beneath the fence was the sage grass which caught fire when the automobile collided with the pole.

As before related the extent of the actual sag between the corner pole and the one next in line was vigorously disputed, one of appellee's witnesses testifying that in the first part of October preceding the accident which occurred on November 21, 1940, the height of the wire above the ground was 22 feet. However this may be, the only witness for appellant who testified as to the condition of the wires on the day of the fatality stated that the telephone wire was high enough above the fence to be beyond his reach, which he estimated to be 6½ feet; and it is undisputed that the energized wire was above the telephone wire. Moreover, it is proven that the two wires had never come into contact.

Although, as above stated, there was testimony that the corner pole leaned slightly prior to the accident, which condition may have resulted from a previous collision, it was not shown that the pole was deficient or lacking in strength. The automobile which struck and broke it and brought about the death of appellant's dece-

dent was traveling at an estimated speed of eighty miles per hour, a force which might well have felled the pole and brought the wire completely to the ground, irrespective of the height at which it had been suspended. The evidence does not show that the mere sagging of the wire constituted a menace, but, assuming that appellee was negligent in permitting the wire to sag, we still find nothing which even remotely suggests that the circumstances which caused the fence to become charged with electricity from the wire suspended above it, were foreseeable. Accordingly, under the authorities, it becomes our duty to affirm the judgment appealed from, and it is so ordered.