# Southeastern Greyhound Lines et al. v. Donohue et al., and Five Other Cases.

June 16, 1944.

Wallace Muir, Leslie Morris, and R. W. Keenon (Stoll, Muir, Townsend, Park & Mohney, Marion Rider, and Robert Matthews of counsel), for appellants.

Kinsolving & Reason (Louis Cox, Colvin Rouse, and L. R. Curtis of counsel) for appellees.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

Of the appeals above captioned, three are from judgments awarding the appellee administrators damages for the death of their respective decedents, and three are from judgments awarding the named individual appellees damages for personal injuries. The deaths and injuries resulted from a collision which occurred during the late afternoon of Saturday, July 18, 1942, between a truck driven by the appellee, Earl Hensley, and ostensibly owned by the appellee, W. A. Patton, and a bus owned by the appellant, Southeastern Greyhound Lines, and driven by the appellant, Edward A. Archbold. The dead and injured were passengers on the bus, which, traveling westwardly from Lexington to Louisville, had reached a point on Highway No. 60 about seven miles east of Shelbyville when it was struck on its left side by the truck which was proceeding eastwardly en route to East Bernstadt, beyond Lexington. It is at once obvious that the collision could not have occurred had each vehicle remained on its proper side of the road, and, since the weather and road conditions were ideal, the vehicles in running order, and the view of the drivers unobstructed, it is apparent that one or both of the drivers must have been guilty of negligence. The jury, trying together these and three other cases arising out of the same accident, placed the blame on both drivers by returning joint verdicts against the Bus Company, the ostensible owner of the truck, and both drivers, except in the case of Miss Kaltenbacker, who sued only the Bus Company; and, while numerous grounds for reversal are urged by the Bus Company and its driver, who alone have appealed, we have found it necessary to consider only one, namely, that the court should have sustained their motions for directed verdicts made at the conclusion of the evidence for the

appellees and renewed after all of the testimony had been heard.

In his opening statement to the jury and in his oral argument in this court, Capt. H. B. Kinsolving, of counsel for the appellees, conceded that the truck, its driver, Hensley, asleep or dozing, crossed the center line of the road into the path of the bus when the two vehicles were only sixty or seventy feet apart, and that this negligence of the truck driver was the primary cause of the accident. But appellees' counsel argue in their joint brief that because Archbold, the driver of the bus, had previously seen the truck veer to the left so as to straddle the center line of the road when it was approximately six hundred feet away and then pull back into its proper path, he should have anticipated that the truck driver might again cross to the wrong side of the road, and taken precaution to avoid the thus foreseeable collision. They interpret Archbold's testimony to mean that the truck, when it first crossed the center line six hundred feet away, continued partially on the wrong side of the road until it was within a hundred and fifty feet of the bus, an interpretation with which, viewing his testimony as a whole, we do not agree. In order that the full effect of Archbold's testimony on this point may be readily comprehended, we quote it as follows:

"While Testifying as if Under Cross-Examination

"Q. When did you first observe the Patton truck, which was being operated by Earl Hensley? A. I saw him all the time from the top of the hill.

"Q. From the top of the hill? A. Yes, sir.

"Q. Where was his truck on the highway when you first observed it at the top of the hill? A. On his side of the road.

"Q. About where on the road, if you know? A. Oh, Two Thousand (2,000) feet.

"Q. And then describe the movement of your bus and that truck from that point to the time the collison occurred. A. I moved on toward Shelbyville. He was on his side, I was on my side.

"Q. Will you tell the jury at what rate of speed your bus was traveling down that hill toward the point of collision after you had observed the approaching Patton truck? A. Approximately forty miles an hour.

* * * * *

"Q. Did the truck aproaching you move or change its position on the road after you first observed it? A. At six hundred feet he gradually crossed over to my side and then back on his side, that is left.

"Q. When the vehicles were about six hundred feet apart? A. Yes, sir.

* * * * *

"Q. And how far did he continue on your side of the road before he got back on the south side, as you have testified? A. Just the length of his truck, approximately.

"Q. What distance would that be would you say? A. Well, twenty-eight to thirty feet.

"Q. How close were you to him when he moved to the south side of the road? A. Well, he proceeded on, of course, I proceeded toward Shelbyville.

"Q. In your judgment how close were you to him when the truck moved back to the South side after having moved to your North side? A. Oh, I don't know. I will say a hundred and fifty feet.

* * * * *

"Q. Now, before the collision occurred, I will ask you to tell this jury whether or not there was any change in the position of the approaching truck? A. No sir, he proceeded, up until the time of the impact he proceeded on his side of the road.

"Q. You mean to tell this jury that he didn't change over to your North side of the road again at any time before the collision actually occurred? A. Yes, I told you at six hundred feet.

"Q. I am not talking about that. I mean when he was closer. A. He suddenly swerved within sixty feet into my path.

"Q. That is what I asked you. When in sixty or seventy feet of you—A. Sixty feet.

* * * * *

"Q. What did you do when he swerved directly in front of you, travelling twenty or twenty-five miles an hour? A. Wasn't anything I could do.

"Q. What did you do? A. When he swerved into my path we hit.

"Q. Did you see that truck driver when he crossed the center line, sixty or seventy feet from you, into your path? A. Yes, sir, he suddenly swerved—it looked like he was sort of slumped over the wheel.

"Q. Looked like he was asleep, didn't he? A. I don't know. He was slumped over like he was asleep.

\* \* \* \* \*

"While Testifying on Direct Examination

"Q. How far was he from you when he first crossed that line, if he crossed it more than once? A. Six hundred feet the first time.

"Q. When he was six hundred feet from you, and you say he crossed the center line, how far, in your judgment, did he go over to his left of that line? A. Approximately the length of his truck.

"Q. Then after he went the length of his truck, what did he do? A. Went back on his righthand side.

"Q. And then on what side of the road, or whereabouts on the road, did he continue to drive from that time on up? A. On his right side.

"Q. Did he then later on cross that line at any time? A. At sixty feet he swerved suddenly into my path.

"Q. Now, Mr. Archbold, when you were on the stand previously and was examined by Captain Kinsolving you said that this truck stayed on your side of the road till it got within a hundred and fifty feet of you. Did you mean to make that statement? (Objected to and objection sustained)

'Q. Did you understand the question that was put to you at the time you made that kind of answer? (Objected to)

"By the Court: Explain your statement.

"Q. Will you explain to the jury the statement you made to Captain Kinsolving about it running on your side of the road up to a hundred and fifty feet of you? A. If I made that statement I probably misunderstood his question.

"Q. Was he on your side of the road at any time between the time you say he got on your side of the road at six hundred feet and the time he suddenly crossed at sixty feet. A. No, sir.

\*     \*     \*     \*     \*

"Cross-Examination

"Q. You testified that you didn't understand when you testified as under cross-examination on a former day of this trial and during this trial in reference to being within a hundred and fifty feet of the approaching truck when it crossed back to the South side of the line. A. I thought you meant if he crossed it any more within a hundred and fifty feet; he didn't until he got in sixty feet."

But even if it had been established that the truck after crossing the center line the first time continued partially in the wrong lane until it was within a hundred and fifty feet of the bus, we would be inclined to hold that the act of its driver in re-crossing the center line so as to place the truck in its proper lane, fully justified the bus driver in assuming that the truck driver was alert and would continue to drive the truck in its proper path. Short v. Robinson, 280 Ky. 707, 134 S.W. 2d 594.

The bus driver is corroborated in his version of the accident by the overwhelming weight of the testimony which may be summarized as follows: James Anderson and Margaret E. Smith, two apparently reputable and wholly disinterested young people, who in an automobile owned by the former and driven by the latter, had been following the truck at a distance of from twenty-five to forty feet for two or three miles, testified that at a point about six or seven hundred feet west of where the collision took place, the truck, traveling at a speed of approximately thirty-five miles per hour, crossed the center line of the road and proceeded eastwardly, occupying from two to three feet of the north lane for a distance of fifty or sixty feet before crossing back over the center line into its proper lane; that the truck then continued in the south lane until it was within fifty feet of the point of collision when it swerved sharply across the center line into the path of the bus; and that when the collision took place, the bus was two or three feet north of the center line of the road.

Stanley Redman, who, we are informed, is a colored man now in the armed forces, testified by means of an affidavit read to the jury:

"I had been following the bus from the time it left Frankfort and was some three hundred or four hun-

dred feet behind it at the time of the wreck. I have driven trucks for a long time and I am able to judge the approximate speed of a motor vehicle. The bus was traveling about thirty-five miles per hour immediately before the accident and was traveling well on its side of the road. I saw the truck coming meeting the bus. It was some three or four hundred yards away when I first noticed it. Shorty after I noticed this truck it pulled sharply to the left of the road or at least three or four feet to the left of the center of the road and from that point it continued on its side of the road. When the truck was within fifty or sixty feet of the bus, the truck suddenly cut to the left of the road and at that time the driver of the bus cut over more to his right. At the time the truck cut to its left side of the road, the left side of the bus was about two or three feet from the center of the road and was traveling in a straight line and at a speed of approximately thirty to thirty-five miles an hour. As the bus driver pulled to the right the right front wheels of his bus were off on the pavement. The truck however cut into the left of the bus and turned over on its right side about the center of the road. The bus left the highway and ran some distance up in a field and stopped.''

Charles Martin, who was at the time of the accident in the bus with Archbold as a ''student driver,'' but who is now employed in a defense plant in Ohio, and hence may be considered a disinterested witness, testified that the bus was traveling from thirty-five to forty miles an hour in its proper lane about a foot and a half north of the center line of the road when he first saw the truck some six or seven hundred feet away; that his attention was attracted to the truck when, at the distance mentioned, it crossed partially over the center line of the road; that the truck traveled partially in the wrong lane only a short distance, approximately the length of the truck, before resuming its proper place in the south lane; and that when the truck was within thirty or forty feet of the bus, it ''swerved over on the left side of the road and struck the bus along where the driver sits in the front of the bus and a little way back from the hood.''

This testimony, except as to the speed of the bus and its distance north of the center line of the road as it approached the scene of the collision, is contradicted

only by the testimony of Hensley which appellees' counsel concede is worthless, a concession no doubt impelled by the fact that Hensley had slept less than two hours during the two nights and the day preceding the accident, went to sleep in the jail a short time thereafter, and later, in referring to the collison, admitted to the jailer that he "might have dropped off to sleep." Moreover, there was testimony which, though contradicted, indicated that he had been drinking. It is true that the appellee, L. C. Donohue, testified that several hours after the collision Archbold told him that he had seen the truck "come zig-zagging before the accident happened," but this statement was properly ruled incompetent as against the Bus Company, and, because of its indefiniteness as to the extent and place of the zigzagging is not necessarily inconsistent with Archbold's quoted testimony. If deemed inconsistent, it nevertheless constituted no more than a scintilla of evidence that the truck crossed to the left of the center line more than once prior to its final swerve into the bus, a scintilla overcome by the testimony of the disinterested eyewitnesses of the truck's movements.

Viewing the testimony as a whole, it is impossible to escape the conclusion that the collision took place north of the center line of the road, and that its immediate cause was Hensley's negligence in permitting the truck to cross over that line into the side of the bus.

Conceding the truck driver's negligence, appellees' counsel contend that the Bus Company is liable because of the "gross and concurring negligence" of its driver; "that he failed to perform four or five of his statutory duties in the operation of his bus as he approached the on-coming truck, after he knew that the driver must have been oblivious to the presence of his approaching bus on the highway and intermittently occupying his traffic lane, that he failed to reduce his speed, control his bus, sound his horn, to change his position on the highway, or do anthing that the law of this Commonweath requires of the driver of a common carrier of passengers for hire in the protection of his passengers."

It is also argued by appellees' counsel in support of their general charges outlined above that the bus was travelling at an excessive rate of speed; that it was being driven too near the center line of the road; that its

brakes were insufficient; that its steering apparatus was loose, making it difficult for the driver to pursue a straight course; and that he failed to keep a sufficient lookout.

We have already discussed and denied the contention that the truck's occupancy of a portion of the bus' lane when the two vehicles were one hundred and fifty feet or more apart required that the bus driver exercise additional care to avoid a collision. It remains to be considered whether any antecedent act or omission of the Bus Company or its driver contributed to the happening of the accident, and whether the latter failed to exercise the requisite degree of care to avoid the collision after the truck had swerved across the center line toward the bus when only sixty feet from it.

The last three of what may be termed the "supporting charges," namely, that the bus driver failed to keep a sufficient look-out; that the steering apparatus was loose; and that the brakes were insufficient, are predicated upon the testimony of one or more of the passengers that the driver and the student driver engaged in conversation; that the bus "was awfully jumpy and wobbly in its movements, and that the driver seemed to have difficulty in holding it in the road"; and upon the testimony of Archbold that the foot or air brake which was broken by the impact of the collision was the only one that had ever been used to stop the bus, since the hand or emergency brake, as in the case of all similar busses, would hold the bus and keep it from rolling only after it had been brought to a stop. Hence, they may be disposed of with the statement that they were not supported by testimony of probative value, and that had it been otherwise, the alleged omissions and violations of duty would fall within the category of non-actionable omissions and breaches of duty, since it was not shown that they contributed in any way to the happening of the collision.

To the same category must be relegated the other acts and omissions charged against appellants even though they were supported by more than a scintilla of evidence. Archbold testified without contradiction that the accident occurred so suddenly that he did not have time in which to sound his horn, apply his brakes, or do anything other than cut the front wheels of his bus to the right, and in this statement he is cor-

roborated by the immutable facts of time and space. If the bus had been travelling at the rate of forty-five miles per hour instead of sixty, as appellees claim, it would have traversed in one second a distance of sixty-six feet, or more than the entire space between it and the truck when the latter crossed the center line. If the driver of the bus had been operating it at a speed of forty miles an hour, five miles per hour less than he might have operated it without raising the statutory prima facie presumption of unreasonable and improper driving, the bus would have traversed fifty-eight and two-thirds feet in the same space of time. At thirty-five miles an hour, its proven speed, the truck in one second would have traveled a distance of fifty-one and one-third feet toward the bus, thus making it obvious that they must have met in approximately one-half of a second after the truck's swerve across the center line. While Archbold testified on cross-examination that he did not know ''off-hand'' in what distance the bus could have been stopped, but that ''possibly'' it could have been accomplished within its length, forty feet, which statement he later retracted after having experimented with a bus of the same type, published statistics on the subject show that the distance in which a motor vehicle travelling at a speed of forty miles an hour can be stopped by the instantaneous application of brakes is eighty-eight feet. Thus, viewed from any angle, it would seem apparent that the speed of the bus, assuming it to have been excessive to the extent claimed by appellees, could not have been a proximate cause of the collision.

It is insisted by appellees that because Archbold testified that when the truck crossed the center line within sixty feet of the bus, he saw the truck driver slumped over the wheel, apparently asleep, he should have sounded his horn since that might have awakened the driver. But here again the time element intervenes and excuses Archbold's failure to sound the horn even if it could be conceived, as we think it cannot, that such sounding would have averted the collision.

Much testimony was introduced in an attempt to establish by marks on the road the exact point on the highway at which the collision occurred, but we shall refrain from discussing it, since, without a reproduction of the diagrams and photographs, such discussion would be fruitless. Futhermore, the only comfort which

appellees could derive from the location of the marks on the road is that, according to their interpretation, some of them indicate that the left wheels of the bus were less than six inches to the right of the center line at and near the point where the collision occurred, instead of from two to three and one-half feet as appellants' proof shows, and some of them, that the bus had pulled off the concrete onto the shoulder of the road a short distance east of the point of collision and was re-approaching the center line at a slight angle at the moment of impact. Appellees do not contend that the bus at any time was driven to the left of the center line of the road in the direction in which it was travelling, and whether the left wheels and side of the bus were a few inches or several feet to the right of the center line at the moment of collision is wholly immaterial in view of the fact that the bus driver was not required to anticipate Hensley's negligent act, which, because of its suddenness, rendered the collision unavoidable.

Assembled in an able brief, the omissions and failures of duty charged against appellants appear formidable. Measured as independent or concurring factors in the result, none of them is sufficient to constitute negligence which could be deemed a proximate cause. Dixon's Adm'x v. Kentucky Utilities Co., 295 Ky. 32, 174 S.W. 2d 19; Rabold v. Gonyer, 285 Ky. 618, 148 S.W. 2d 728; Risen v. Consolidated Coach Corp. et al., 274 Ky. 342, 118 S.W. 2d 712; Leming's Adm'r v. Leachman, 268 Ky. 781, 105 S.W. 2d 1043; Thronton v. Phillips, 262 Ky. 346, 90 S.W. 2d 347; Knecht v. Buckshorn et ux., 233 Ky. 329, 25 S.W. 2d 727.

It may be that the day will come when the lawmakers will require that those who, for profit, elect to use the public highways for the carriage of passengers, shall indemnify those who entrust them with their safety against loss of life and limb through the wanton or negligent acts of irresponsible and insolvent drivers of other vehicles whose presence on the roads constitutes an unceasing menace. However, it is not within our power to obliterate the present rule of law which tests their right to recover against the carrier in a case such as this by the query: Was it guilty of negligence which caused or contributed to their injuries? Having indicated our negative answer, it is unnecessary to discuss the merits of the other grounds urged for reversal.

Judgment reversed for proceedings consistent with this opinion.

Whole Court sitting.