**GLASGOW REALTY COMPANY, Appellant,**

v.

**Vivian L. METCALFE, Appellee.**

Court of Appeals of Kentucky.

June 23, 1972.

James H. Lucas, William J. Rudloff, Harlin, Parker, Ricketts, Lucas & English, Bowling Green, for appellant.

Harry Berry, Glasgow, for appellee.

EDWARD P. HILL, Jr., Judge.

This appeal is from a judgment entered on the verdict of a jury which awarded appellee, Vivian Metcalfe, $47,500 damages for personal injuries she claimed resulted from appellant's negligence in maintaining a glass window in one of its third-floor apartments.

Appellant is the owner of a three-story building that stands flush with the sidewalk on the public square and in sight of the courthouse in Glasgow, Kentucky. The first floor is leased to merchants, the second floor as offices, and the third floor is divided into apartments.

On August 1, 1969, nine-year-old Marty Stout, in the company of his parents, went to one of the third-floor apartments to visit Marty's grandmother. Finding the place uninteresting, Marty wandered into a nearby apartment occupied by the William Mayo family. On this day the merchants of Glasgow were having a "Sidewalk Sale Day," which attracted a large crowd to the public square. Young Marty Stout raised, or discovered raised, a lower sash of one of the windows immediately above the sidewalk on the public square. He naturally proceeded to enjoy his high perch by attracting the attention of interested and curious youngsters below by "hollering" to them. His conduct did not meet with the approval of seventeen-year-old Linda Mayo, one of the occupants of the apartment. She proceeded to pull the raised sash down to its proper position to abate Marty's conduct. The latter placed both hands against the glass, either to prevent the closing of the window, or to assist Linda in closing it. Thereupon, the glass of the lower sash broke and fell to the sidewalk, striking an awning above the first floor causing the glass to further shatter. Numerous people, including appellee, were milling about the sidewalk when the glass fell. The crowd stampeded to avoid the falling glass. Some unknown person ran into appellee, Vivian L. Metcalfe, and knocked her down, as a result of which she received a fractured hip and numerous lacerations. Although appellee was only 52 years of age at the time, her injuries proved to be more serious than anticipated. She required constant care for over seven months and proved special damages of about $7,500. The tes-

timony indicated that she is 25 to 35 percent permanently disabled.

Appellant presents five grounds for reversal of the judgment, the first of which is that it was entitled to a directed verdict.

The chain of events in the instant case suggests a number of interesting legal questions, such as of intervening and superseding cause and the foreseeability of the consequences of a defectively maintained glass window. First, however, we should get to the basic, fundamental question of appellant's duty with respect to the maintenance of the glass window in question, and then determine from the facts whether appellant violated that duty.

Before discussing appellant's duty, we should get a birdseye view of the situation. The glass window in question was in a third-floor apartment where children were known to live. It was immediately above the sidewalk where pedestrians were known to be and had a right to be. A screen or storm window had been installed but was useless at the time due to the fact that the screen was out. The window cords at the lower sash were broken and inoperative.

■ Unquestionably it was the duty of appellant to inspect its building for dangerous conditions that were likely to result in injury to persons using the sidewalk below.

We now turn to the evidence that bears on the claimed defective condition of the window sash. This evidence consists of the testimony of William Mayo, his daughter Linda Mayo, nine-year-old Marty Stout, and Maurice Wolfe (appellant's manager) together with certain photographs introduced in evidence, which appellant objected to to and argues here were incompetent. More about the photographs later.

We quote the following testimony relative to the condition of the sash:

### WILLIAM MAYO

"53. Billy, do you recall what the condition of this window that was broken out or broke out, what the condition of it was as to being fastened into the window frame prior to the time that it was broken out or broke out?

"A. It wasn't too much putty in it.

"54. Now, is that a condition of many of the windows in that building?

"A. Yes sir.

"55. Are there several of these windows up there that have the screens torn off of them?

"A. Yes sir.

"56. And on the date of this accident, this screen was off this window?

"A. Yes sir.

\*     \*     \*     \*     \*     \*

"58. Well, are there many glasses broken in this building all over there?

"A. Yes sir.

"65. Now, the window frame and wooden sash or frame was in good condition, wasn't it?

"A. No sir.

\*     \*     \*     \*     \*     \*

"67. The window itself was in good condition, wasn't it?

"A. Yes.

"68. It wasn't cracked, was it?

"A. No sir.

"69. You didn't have any difficulty pulling the window up and down by the handle, did you?

"A. No sir.

"70. These ropes that are supposed to be attached to the window, were they ever attached to the window?

"A. No sir.

"71. And those are what you use to tie weights on, or weights are tied to them to lift the window up and down, aren't they?

"A. Yes sir."

## LINDA MAYO

"Q 26 And you pulled down the window?

"A Yes.

"Q 27 And then what happened?

"A Then I let down the window and then he pushed it out with two hands. I told him not to, and he did anyway.

"Q 28 He pushed out the window pane?

"A Yes.

"Q 29 Did he put both hands on the pane and push?

"A I think he did.

"Q 30 Well, did you see him do it?

"A Yes.

"Q 31 Did you warn him not to push on the pane?

"A Yes, I did.

"Q 32 All right. He pushed on the pane, and then what happened?

"A He knocked it out.

"Q 33 Did the window pane break and fall out?

"A I don't know.

"Q 34 Well, tell us what happened. Describe it in your own words—what happened?

"A Well, I think that's what he done, what you said awhile ago.

"Q 35 Well, you tell us. You tell us in your own words what happened.

"A Well, I don't know how to say it.

"Q 36 Well, when the boy put his two hands up on the pane and pushed on it, did it break?

"A Yes, it did.

"Q 37 After it broke, did it fall out?

"A Well, not all of it, some of it. And then I took out the rest of the pieces that was on it—took it out.

"Q 38 All right. And when it fell out, did it fall down on the sidewalk?

"A Yeah, and they was some putty around it, too.

"Q 39 Linda, was this glass broken or cracked in anyway before the accident?

"A No.

\*  \*  \*  \*  \*  \*

"Q 48 And you said this window was not cracked?

"A No.

"Q 49 The pane was cracked, wasn't it?

"A Yeah, the pane was.

\*  \*  \*  \*  \*  \*

"Q 51 I'm asking her: At the time this happened, was the window pane already cracked?

"A No, it wasn't.

\*  \*  \*  \*  \*  \*

"Q 53 And you say it had putty around it, or didn't have putty around it?

"A Well, it was put on the outside.

"Q 54 All the way around the outside?

"A I didn't see that closely.

\*  \*  \*  \*  \*  \*

"Q 55 And it had things that pulled it up and down. They were tied in there good too, weren't they, Linda?

"A There weren't things in that window.

\*  \*  \*  \*  \*  \*

"Q 59 And is it hard to put up and down?

"A (Witness nods her head in a negative answer).

"Q 60 It's not?

"A No.

"Q 61 Well, then what holds it up, Linda?

"A I don't know.

"Q 62 If it just goes up and down real easy and there's no weights to hold it, what holds it up?

"A I don't know.

"Q 63 The ropes are broke off, aren't they?

"A Yeah.

"Q 64 And then the weights and the things that guide the window up and down aren't on it, are they?

"A No.

\* \* \* \* \* \*

"Q 68 And ropes aren't even tied to it to keep it from falling down?

"A No.

\* \* \* \* \* \*

"Q 71 (Interrupting) He didn't push the window up again?

"A No, he knocked the window out.

"Q 72 You said he had his hand on the window when it went out. Is that correct?

"A He walked over there and put his hands on it and knocked it out. He pushed on it real hard.

"Q 73 Oh, I know. What did he push on?

"A On the window.

\* \* \* \* \* \*

"Q 75 Well, you said he had his hands on it when—

"A (Interrupting) He had it on the white thing around it.

"Q 76 'He had his hand on it when it went, and he still had his hands on it.' (Reading) Now, how could he have had his hands on it if it had gone out?

"A You know where the white thing is around the window?

\* \* \* \* \* \*

"Q 78 He had his hands on the frame then is what he had his hands on. Right?

"A Yeah.

"Q 79 And not the window glass?

"A Because the window was knocked out, yeah.

"Q 80 But he really had his hands on the frame instead of the glass?

"A Yeah.

"Q 81 You stated before that he said he was trying to pull the window down. Is that correct?

"A No, it isn't.

"Q 82 He didn't say that?

"A He didn't tell me that.

"Q 83 Well, if he himself testified—

"A (Interrupting) Yes, but he wanted me to lie about it—

\* \* \* \* \* \*

"Q 85 Who did?

"A Marty did, and his grandmother did, too."

MARTY STOUT

"20. Now, Marty, what happened over there in regard to this window when the glass fell out?

"A. We was pushing it down.

"21. And who was pushing it down?

"A. Linda Mayo and I.

"22. And you. And just explain to the jury what you done as far as you remember.

"A. I grabbed hold of it like that. I didn't push it out.

"23. Were you pulling it down or trying to get it down or what were you trying to do?

"A. Trying to get it down.

"24. Was there any screen wire on that window?

"A. I don't think so. There was one had glass in it before though.

\*   \*   \*   \*   \*   \*

"42. Now, why did Linda shut the window?

"A. I don't know. We was just shutting it.

"43. Weren't you hollering out the window at some people down on the sidewalk?

"A. I was hollering at a boy. I wasn't hollering at everybody.

\*   \*   \*   \*   \*   \*

"45. And did Linda ask you to q'uit hollering out the window at the boy?

"A. I don't know.

\*   \*   \*   \*   \*   \*

"48. She didn't have any trouble pulling the window down, did she?

"A. No sir. I don't know. I helped her anyway. I didn't push it out.

"49. Well, when you went over there to help her, did you put both hands on the window pane?

"A. The window in the middle?

\*   \*   \*   \*   \*   \*

"Q52. You put both hands on the windowpane?

"A. Yes.

"53. And did you push on the pane?

"A. I didn't push it out.

"54. Sir?

"A. I didn't push it out.

"55. Well, I mean did you push on the pane with your hands?

"A. I don't know.

"56. Well, did you, or didn't you?

"A. I don't know.

"57. But you did put both hands up on the window pane like this and help her try to pull it down, is that right?

"A. Yes.

"58. So, necessarily, you had to push on the glass, didn't you?

"A. I don't know.

"59. Didn't Linda tell you not to push on the window?

"A. I don't know that.

"60. While you had your hands on this glass and were helping her with the window, as you say, the glass broke, didn't it?

"A. Yes sir.

"61. And fell out?

"A. Yes sir.

"62. Now, Marty, I don't want to embarrass you or anything, but I want to ask you one question. Think carefully about it. When you had your hands on that window pane, weren't you pressing on the window pane?

"A. I don't know.

"63. Well, didn't you have to press on the window pane to push it down?

"A. I guess. I don't know. I might have, and I might not have.

"64. Marty, did you notice—do you know what the putty around the window is that holds the glass in?

"A. I don't believe there was very much.

"65. There wasn't much around it. Was the window broken, or do you remember?

"A. It had a little crack in the top.

\*   \*   \*   \*   \*   \*

"67. Marty, had you ever looked at this window before this accident happened?

"A. I don't know. My grandmother said it was cracked. She was over there last weekend looking at it.

"68. Truth of the matter is, you don't know whether it was cracked or not, do you?

"A. Might have been, and might not."

MAURICE WOLFE

"113. Now, if the paint were gone and if the ropes that let it up and down were gone, and if part of the putty was gone from around the glass in the sash, wouldn't that indicate a fairly deteriorated and poor condition?

"A. And if all that was so, yes.

\* \* \* \* \* \*

"116. But the screen, if it were in the window at the time of this time that the window glass either fell out, broke out, anyway, came out, if it were in there at that time, unless somebody drove it with a terrific force, this screen would have caught all the glass in that window?

"A. Right."

Appellee offered sixteen photographs of various views of the appellant's building, only one of which showed the window in question. These photographs are of little assistance on the vital question in the case. The particular photograph of the window from which the glass fell is of no benefit as it shows no details of the conditions, only that the paint was old and cracked.

■ From the foregoing evidence, two salient facts emerge: First, it is clear from the admission of appellant's manager that there was a failure to inspect the condition of the window in question; secondly, the condition of the window was defective to the extent that at least some of the putty was gone from around the glass,[1] and the screen was out. These facts made a jury issue on the question of appellant's negligence in the maintenance of the premises in question. See Smith v. Earl Douglas Hanson, Inc., 9 Misc.2d 244, 170 N.Y.S.2d 866, and Beaumont Iron Works Co. v. Martin, (Tex. Civ.App.) 190 S.W.2d 491, 29 A.L.R. 77.

Appellant's next argument is directed at the admission of the photographs of various views of appellant's building and of parts of it. Some of the pictures showed windows other than the one from which the glass fell. We think some of the photographs were not helpful on the real issue, but we do not find any of them portrayed anything detrimental to appellant. In fact, we believe they benefited appellant's position.

Appellant's third question relates to the instructions given or offered. First it contends that Instruction I given by the court "deviated substantially from the language of the general standard of care, and inserted surplusage and extraneous wording, which actually held appellant to a higher standard of care than that required by law."

■ Instruction I placed upon the appellant the duty to "use ordinary care in the upkeep and maintenance of the window in said building from which the glass fell, so as to make and keep said window in said condition as would make it reasonably safe for persons, such as the plaintiff using \* \* \* sidewalks adjacent to the building." Instruction V defined ordinary care. We can find nothing wrong with this instruction.

■ The second part of the argument pertaining to the instructions is that the court should have given appellant's tendered instruction two, which covered "in-

---

[1]. Putty has two functions. Its primary use is to hold the glass in, although pointed metal wedges are first driven into the wooden window frames to hold the glass until the putty is spread in place and sets. Its second function is to protect the wooden window frame from the weather.

tervening or superseding" causes. The trial court covered all to which appellant was entitled in the third instruction when he instructed the jury that it could find for plaintiff if the falling glass was caused by the concurring negligence of appellant and Marty Stout. See Snydor v. Arnold, 122 Ky. 557, 92 S.W. 289; Louisville Home Telephone Co. v. Gasper, 123 Ky. 128, 93 S.W. 1057; Brown v. Chesapeake & O. R. Co., 135 Ky. 798, 123 S.W. 298; and Commonwealth, Department of Highways v. Begley, Ky., 376 S.W.2d 295.

Appellant's fourth argument charges that two of the jurors trying the case were observed "inspecting and discussing" the appellant's building. The affidavit of appellant's manager stated that he observed two of the jurors "viewing the premises * * * and they engaged in conversation concerning the building and painted (sic) upward toward the window in question"; and that the two jurors "then stepped down to the Green Street side of the building and continued their inspection and discussion concerning the premises." The affidavit does not state any of the details of the conversation. The affiant stated he observed these jurors while he, affiant, was walking to the courthouse.

■ The appellant's building is 150 feet and immediately across the public square from the courthouse and is in plain view. The trial court was not asked to investigate the occurrence. Appellant made a verbal motion "for a mistrial," nothing more. Without question jurors should not discuss any subject pertaining to the case until the time for making a verdict. However, it was physically and humanly impossible to close the eyes of the jury to obvious conditions of the environment. One of the jurors mentioned in the affidavit voted for the verdict, and the other one did not sign the nine-juror verdict. While we do not approve of such conduct on the part of jurors, but condemn it, yet under the total circumstances

we cannot say that the trial court abused a sound discretion in overruling the motion for a mistrial.

■ Although appellant does not list the subject of intervening or superseding cause, except to complain that its offered instruction relative to intervening cause was refused by the court, since a substantial part of appellant's brief and a large part of the appellee's brief are devoted to the subject, we consider it appropriate to go into the question in some depth. The intervening cause refers to the action of Marty Stout in placing both hands against the glass window, as a result of which the glass or a part of it broke and fell to the street. There is no way the force applied by Marty can be measured. The fact that portions of the glass remained in the sash after part of it fell out is some evidence that considerable force was applied by Marty, and it is also some evidence that not all of the glass was unsupported (by putty or metal pins). Anyway, we think from all the evidence and all the circumstances that Marty's act constituted a "contributing cause of the accident." The question then is whether the contributing cause relieves appellant of liability.

We go to Restatement of the Law (Torts) 2d, § 439, for some light on the subject. Therein it is written:

"If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability."

This court in Parker v. Redden, Ky., 421 S.W.2d 586, 595, said:

"The principle involved here is simply the basic principle of the law of intervening or superseding causes—that the

original negligent actor is not relieved of liability by the subsequent negligent acts of another if the subsequent acts might reasonably have been foreseen. See Ambrosius Industries, Inc. v. Adams, Ky., 293 S.W.2d 230; Mackey v. Spradlin, Ky., 397 S.W.2d 33."

Before concluding this opinion, we should discuss another phase of this case that has been treated in the briefs although not listed specifically in the "questions presented" part of the briefs. That phase relates to the question of liability for the "unforeseeable consequences" of what the jury found to be negligence on the part of appellant.

Appellant argues that even if it was guilty of some fault it could not anticipate or foresee that a stranger would come into its building and apply sufficient force to break out a glass window, and further that appellant would not reasonably foresee the extent of injury from falling, shattered glass, or that plaintiff would sustain a freak injury by being trampled over by the stampeding crowd.

This question was ably discussed in Miller v. Mills, Ky., 257 S.W.2d 520, 522, wherein the court said:

"We think it is clear that so far as foreseeability enters into the question of liability for negligence, it is not required that the particular, precise form of injury be foreseeable—it is sufficient if the probability of injury of some kind to persons within the natural range of effect of the alleged negligent act could be foreseen. Morton's Adm'r v. Kentucky-Tennessee L. & P. Co., 282 Ky. 174, 138 S.W.2d 345; Dixon v. Ky. Utilities Co., 295 Ky. 32, 174 S.W. 2d 19, 155 A.L.R. 150."

The judgment is affirmed.

STEINFELD, C. J., MILLIKEN, NEIKIRK, PALMORE, and REED, JJ., concur.

OSBORNE, J., does not concur.