### BEAUMONT IRON WORKS CO. v. MARTIN et ux.

No. 4302.

Court of Civil Appeals of Texas.

Oct. 4, 1945.

Rehearing Denied Nov. 14, 1945.

492

Marcus & Carrington, of Beaumont, for appellant.

C. E. Pool, of Beaumont, for appellees.

WALKER, Justice.

Appellees Sam Earnest Martin and wife, Charlcie Martin, brought this action against appellant Beaumont Iron Works Company to recover damages resulting from personal injuries sustained by the said Charlcie Martin. Plaintiffs alleged that a pane of glass fell from one of the top windows in defendant's building and struck Charlcie Martin on the head as she walked along a sidewalk adjacent to said building, whereby she was injured, and, in substance, that said glass was caused to fall and said injury resulted from defendant's negligence, as follows:

"(a) In allowing said heavy glass window in Defendant's building along said sidewalk to become loose in the frames to such an extent that such window or windows could fall and strike plaintiff's wife, Charlcie Martin, as herein alleged, or other persons similarly situated.

"(b) In allowing pressure from workmen or tools or other material within said building to push or strike said windows, thereby pushing or knocking the same out of its frame on to the side-walk thereby striking plaintiff's wife, Charlcie Martin,

as herein alleged, or other persons similarly situated.

"(c) In not keeping said heavy glass window panes securely fastened and attached to the frames to prevent the same from falling out or being knocked out of said frames on to the sidewalk and injuring and damaging plaintiff's wife, Charlcie Martin, or other persons similarly situated on said sidewalk."

Trial was to a jury. In response to various special issues, the jury found that Charlcie Martin "was struck on her head by a pane of glass falling from the upper row of windows in defendant's building as she walked along the sidewalk adjacent to said building"; that defendant "allowed said window pane to become loose in its frame to such an extent that it could fall therefrom," which was negligence and a proximate cause of Charlcie Martin's injuries; that defendant "failed to keep said window pane securely fastened and attached to the frame so as to prevent the same from falling out," which was negligence and a proximate cause of Charlcie Martin's injuries; and that Charlcie Martin's injuries were not the result of an unavoidable accident. On these findings, and that in response to Special Issue 9, submitting the matter of damages, the trial court entered judgment in behalf of plaintiffs against defendant for $1,788.40.

Defendant assigns error to this judgment under Points 1, 2 and 3 on the ground that the evidence does not support the findings of negligence. These points resolve into two contentions, namely: (1) Plaintiffs' allegations of negligence are specific, not general. Therefore the res ipsa loquitur doctrine is not applicable to this case, although it would be otherwise; and plaintiffs, who accordingly must prove the specific negligence alleged, are charged with the burden of proving what caused the pane of glass to fall (and that defendant had been negligent respecting said cause). This they have not done. Instead, the evidence shows nothing beyond the happening of the alleged accident, namely, that the glass fell and struck Charlcie Martin, and while this would support a finding of negligence under the res ipsa loquitur doctrine it would not otherwise. (2) Furthermore, as respects the accident referred to, it is as probable under the evidence that the glass fell by reason of some matter for which defendant was not liable as it is that the defendant's negligence caused the glass to fall (and plaintiffs have thus failed to sustain the burden of proof).

■ Defendant's Points 1, 2 and 3 are overruled. It has been broadly stated that the doctrine of res ipsa loquitur will not be applied under specific allegations of negligence, and perhaps the allegations of negligence before us are to be regarded as specific instead of general. Nevertheless plaintiffs could prove their allegations of negligence by circumstantial evidence; and it is believed that the record contains adequate circumstantial proof of defendant's alleged negligence within the principles laid down in Roberts v. Texas & Pacific Ry. Co., 142 Tex. 550, 180 S.W.2d 330, and decisions referred to in that opinion, especially McCray v. Galveston, H. & S. A. Ry. Co., 89 Tex. 168, 34 S.W. 95, reversing 32 S.W. 548; and in Billingsley v. Texas & N. O. Ry. Co., 131 Tex. 410, 115 S.W.2d 398; and in the decisions of the Courts of Civil Appeals in Southwestern Tel. & Tel. Co. v. Sheppard, 189 S.W. 799 and Collins v. Gulf Building Corporation, 83 S.W.2d 1093. These circumstances definitely show how Charlcie Martin was injured and how defendant was related to the cause and manner of her injury. They logically tend to prove that plaintiffs' allegations of negligence are true and for this effect depend, not upon any positive rule of law but upon the same process of fact inference whereby, in any case, a fact is established by circumstantial evidence. The rule of decision contended for by defendant is therefore not controlling.

We will state the circumstances referred to. Defendant's works include a steel foundry which is operated in a building on Crockett Street in the City of Beaumont. This building runs the entire length of the block, 300 feet or more, and is separated from the street by a public sidewalk, apparently made of concrete. This building is well over 40 feet high. Two rows of windows have been let into the wall on the Crockett Street side, and the upper row is 20 feet or more above the surface of the walk. These upper windows are opened from time to time. When opened, the lower half extends out over the sidewalk, and is about 25 feet above the surface of the walk. The foundry equipment includes two cranes of great capacity which must be of considerable size and weight. These cranes run on tracks extending the entire length of the building. The tracks are 30 or 40 feet apart and

are placed well above the ground, so that the operator when in the cab is about on a level with the top of the upper row of windows. Albert LeDay is defendant's crane operator; he testified that he had been in defendant's employ since 1928.

On the morning of July 17, 1944, at about 9:30 o'clock, Charlcie Martin, in the company of Ora Gibson, walked along this sidewalk. They were negro women, employees of the Missouri Pacific Railway Company, and were on their way from the Missouri Pacific yards to the Missouri Pacific freight house. About the middle of the block Charlcie Martin passed beneath one of the upper windows in defendant's building, and at that precise moment the aforesaid Albert LeDay, standing in the cab of his crane, opened this window; and as the window swung out over the walk a pane of glass fell from the window frame and struck Charlcie Martin on the head. She sustained concussion and serious injury as a result. Something also struck Ora Gibson on the shoulder. She thought it was a fragment of the pane which struck her companion.

The pane of glass which struck Charlcie Martin was 14 by 19 inches in size, about one fourth inch thick, and had wire in it. This is sometimes referred to in the record as net wire. Such references suggest the pattern formed in the glass by the wire, but there is no evidence to show how much wire was in the glass, nor any other characteristic of said wire. This pane would ordinarily have been held in place in the window frame by six wire pins and by putty. The evidence does not show how these pins were arranged about the pane. The witness Engman describes these pins and how they were held in the frame as follows: "There are six wire clips, steel wire clips; we call them clips; they are some crooked little wires; there is a hole in the sash; you stick one point in the sash and the other goes against the glass. There are six of them holding each pane." It is evident that the putty served not only to fix the pane but also to bind these pins and prevent their falling out, and that it was necessary for both purposes. It appears from Engman's testimony that this pane would fall when the window was opened if it was loose, but that "if a window pane is to fall out, the putty has to come loose first." Four of these glass panes, fitted into a frame, constituted the window, and only one of said panes fell

from the window in question. This window was opened by pulling on a chain attached to the top of the window frame and hanging inside the building. As it opened, the window pivoted at its center; the top part swung back into the building and the lower part swung out over the sidewalk. By fastening the chain to a hook the window was held open; and in this way LeDay opened and locked in place the window in question.

When the window was open and extended over the sidewalk, the panes of glass did not rest on the frame. Instead, they were held in place and kept from falling by the wire pins referred to, and by the putty.

The evidence does not show when the particular window and pane of glass were installed in the building. However, Engman testified that he had been in defendant's employ about 17 years (the trial was held in January, 1945, after the accident of July 17, 1944); and that it was his duty to inspect these windows, and that in all the 17 years he had been working there, the pane which struck Charlcie Martin was the first to fall from the upper row of windows. From this the jury could conclude that said pane had been in the window approximately 17 years before it fell, or else that defendant had installed it at some time less than 17 years before that time.

Defendant's right to extend the window over the sidewalk has not been questioned.

Indubitably, the pane was loose in the frame when Albert LeDay opened the window, and this was the immediate cause of its falling. However, the evidence does not show with precision exactly what caused the pane to be loose at that particular moment. LeDay saw the pane fall out of the frame, but said he did not see it strike. Charlcie Martin and Ora Gibson did not know the pane had fallen until they were struck. Albert LeDay discovered the injury to Charlcie Martin by looking out of the window after he saw the pane fall, and after he had hooked the window chain in place, but professed, in substance, to know nothing about the condition of the window. Engman testified that he replaced the pane for defendant; that he was told about the pane falling out of the window as soon as it happened, and that he "went up there to see"; but neither party attempted to elicit evidence from him respecting the appearance and

condition of the window or that part of the frame where the fallen pane had rested; and no evidence pertaining to these matters is in the record. He did not remember how long it had been prior to the accident that he had inspected the window, but professed to have no "knowledge of any defect or anything wrong with the particular pane of glass."

However, the evidence does indicate possible reasons for the pane being loose at the time in question; and since plaintiffs did not allege what caused the pane to be loose, and since the issues submitting negligence were cast in the language of plaintiffs' pleadings, these matters all fall within the scope of said pleadings and issues. (1) There is ample evidence that the operation of the foundry produced a great deal of vibration. This was especially noticeable when the cranes were carrying the heavy loads of metal for which they were maintained. Along the Crockett Street wall in which these windows were let there were boxes evidently used to form castings. These were filled with sand, and sand was delivered in large metal containers to these boxes by the cranes. These metal containers were emptied by tilting, and were then hammered against the wall itself. Vibration incident to these and other normal foundry operations would necessarily tend to loosen the pane in the window frame, and some evidence to this effect was given by Richardson, who had been employed by defendant for some eight years and was familiar with this vibration. (2) The manner in which this single pane of glass fell from the window frame suggests that improper installation may have contributed to the pane being loose.

The record will not support a conclusion that the pane which struck Charlcie Martin had been loosened by an application of force. There is no evidence in the record as to whether force had ever been applied to any of these upper windows, from either outside or inside the building. If any one outside the building ever did anything to any of these upper windows, the fact has not been proved. Nor, indeed, does it appear that any of defendant's employees ever did anything to these upper windows except Engman, who inspected them from time to time. The only other employee who apparently ever came near them was Albert LeDay, who operated his crane on tracks in their vicinity. Whether defendant's operations might come in contact with the upper windows is to some extent, on this record, a matter of speculation; but we note that Engman testified that no "tools or other objects" were ever "used around there that would touch any of the windows in the upper row."

■ The circumstances detailed above support the following conclusions: (a) When the window extended over the sidewalk it was an imminent source of danger to pedestrians rightfully on the walk unless defendant exercised care to maintain the glass panes tight in their frame; and defendant owed Charlcie Martin, who was rightfully on the walk, the duty to exercise such care. (b) It was unlikely that the pane of glass which struck Charlcie Martin, or that the window containing this pane would ever be affected by any operation other than operations of the defendant. The window was over 20 feet above the surface of the walk and was inaccessible to any ordinary public activity. Such causes for the loosening of the pane as are raised by the evidence were incidents of defendant's operations, or at any rate the jury could so believe. (c) The pane had either been in the window for about 17 years before Charlcie Martin was injured or else defendant had installed it in the building less than 17 years before that time. Accordingly, defendant had an opportunity to know the condition of the pane before it fell from the window. This opportunity was certainly adequate as regards defendant's own activities. (d) The pane of glass which struck Charlcie Martin was not large. To install it properly was a simple matter and to maintain it tight in its frame should have required small foresight and less effort. (e) The pane was loose in the frame when Albert LeDay opened the window, and this condition was the immediate cause of the pane falling. (f) It seems wholly improbable that this pane would ever have become loose and have fallen when the window was opened unless defendant had failed to use care to see that it was tight in its frame.

■ This constitutes sufficient circumstantial proof of the alleged negligence. Since there was evidence from which the jury could conclude that the pane probably would not have fallen if defendant had used care to see that it was tight in its frame, they could find that defendant did not so maintain it and that defendant was

negligent in failing so to do. McCray v. Galveston H. & S. A. Ry. Co., 89 Tex. 168, 34 S.W. 95, at page 98, and other authorities listed above. This is an inference of fact, precisely like any other fact inference; and the right to make it and the conviction it carries depend upon ordinary rules of logic and not upon rules of law. It seems to be a result of defendant's contention that this type of inference can not be made as an element of circumstantial proof to establish specific allegation of negligence, but the contrary is established by the foregoing authorities in a case where the inference is based upon and supported by evidence in the record. Plaintiffs' pleadings do not affect their right to make this inference. Plaintiffs did not allege any reason why the pane was loose in its frame, except generally, because of defendant's negligence; and the inference of negligence is precisely as broad as the pleadings. It seems to us that plaintiffs proved neither more nor less than they alleged. If the issue was in the record, that some cause other than defendant's negligence loosened the pane, the burden was not on plaintiffs to carry their proof further than they did. Plaintiffs made out a prima facie case, and it was accordingly defendant's burden to produce evidence of a cause for which defendant was not liable, or to produce evidence showing that defendant was not otherwise at fault in the matter. See Roberts v. Texas & Pac. Ry. Co., 142 Tex. 550, 180 S.W.2d 330, at pages 331 and 332. All such matters were peculiarly within defendant's knowledge.

Defendant undertook to disprove an inference of negligence. Under Point 4 defendant assigns error to the judgment on the ground that the evidence shows full performance and discharge of the duty of care owed Charlcie Martin by defendant. Point 4 depends upon the testimony of Engman, showing that this witness had inspected the upper windows from time to time. Engman said that he was employed by defendant, and his testimony showed that he had been so employed for about 17 years at the time this case was tried. We note that the trial occurred in January after the accident occurred on July 17th. He also testified that it was his duty to inspect and repair the windows and that during the 17 years he had been working there, no pane had ever fallen from these upper windows. Richardson, another employee of defendant, who had worked for defendant about eight years before the case was tried, said

that he did not know of any pane having been caused to fall from the upper windows "by opening the windows"; he knew that windows in the lower tier were sometimes knocked out. It is defendant's position that the inspection shown was adequate and discharged the duty of care owed Charlcie Martin.

Point 4 is overruled. Richardson's testimony is negative. Engman's evidence as to inspection was very general. He said that he had inspected the particular window along with the others but he did not remember when the last inspection thereof had been made. He testified that the inspection "will average about probably, we will say, four times a year or oftener. Sometimes every two months." The jury could conclude that inspections were irregular and followed no orderly routine. Since the longer a pane of glass remained in one of these windows the more likely it was to fall, the burden of inspection resting upon defendant could be expected to become heavier with passage of time and an irregular course of inspection does not indicate an exercise of foresight and care. There was also evidence from which it could be inferred that inspections were casual. Engman said that it was easy to find out whether the windows were properly fastened "because if a window pane is to fall out, the putty had to come loose first; so I could fix it." Perhaps Engman looked only to see whether putty had fallen out. Albert LeDay operated his crane in the immediate vicinity of these windows and these inspections made singularly little impression on him. He referred to them in the most general terms and said that "sometimes they got somebody to look after" this matter of inspection. He did not remember when the last inspection was made.

■ This evidence does not show as a matter of law that the defendant had fully performed its duty of care to Charlcie Martin. With this record before it, the jury could still believe that the defendant was negligent in failing to see that the pane of glass was tight in its frame.

Defendant assigns error under Point 5 to the action of the trial court in overruling the following objection to Special Issue 9, submitting the matter of damages: "Such issue does not affirmatively exclude from the consideration of the jury any physical pain, past, present or future, or any past or future loss of earning capacity which is due to constitutional, organic or other condi-

tions unrelated to any injuries sustained by Charlcie Martin, and which were not proximately caused or brought about by any negligence of the defendant and thus would permit the jury to assess damages for conditions and effects for which it is not responsible, and the defendant now requests the court to modify and correct such charge accordingly."

This objection was based upon certain testimony of Dr. Ferguson, the physician who treated Charlcie Martin. Charlcie Martin said that when her husband returned from work on the day of the accident he took her to Dr. Ferguson. Earlier in the day she had been examined by Dr. Toomin, at the instance of defendant. Dr. Ferguson had not treated her before. He made an examination, and sent her home. She remained at home for 8 or 10 days, receiving certain treatment, but did not rest or sleep well and Dr. Ferguson accordingly sent her to a hospital in order that she could obtain proper rest. She stayed there five days. She then returned home and Dr. Ferguson continued to treat her at intervals, once at her home shortly after she left the hospital and thereafter at his office. Charlcie Martin complained of dizziness and headaches, and of some pain in her left eye and ear. Dr. Ferguson gave evidence tending to show that the blow on her head from the pane of glass resulted in a moderately severe concussion, from which she had not recovered, although her condition had improved, and further tending to show that the symptoms of which she complained were caused by this concussion.

Dr. Ferguson was a general practitioner, and as a part of his examination sent Charlcie Martin to Dr. Ledbetter, an X-ray specialist. Dr. Ledbetter made an X-ray examination of Charlcie Martin's skull and sent Dr. Ferguson a report. After he had given the testimony referred to above, Dr. Ferguson read this report in evidence without objection from either party, and Dr. Ledbetter himself later gave testimony discussed below. This report showed that Charlcie Martin's skull was thicker than that of an ordinary person and also showed "a slight tendency to prognathus but no beetle brow." Dr. Ferguson's testimony follows, interpreting this report as showing certain characteristics of the pituitary gland in Charlcie Martin's head:

"Q. From the X-ray picture taken by Dr. Ledbetter, does that say anything to you as a medical man as to any condition of the woman other than a normal condition? A. Oh, yes; this woman has a disturbance in what is known as the pituitary gland at the base of the skull. That is a small gland that operates all the rest of the glands, and is the master gland that operates the whole individual. She has some disturbance in there; but a great many people do have disturbance in that gland; all these big fellows have it.

"Q. The pituitary gland is the gland that controls and affects the growth of people, doesn't it? A. Every glandular activity controlled through this gland.

"Q. These giants you see in these circuses, does that indicate that they have had some disturbance with respect to their pituitary gland? A. That's right.

"Q. That is a different type of disfunction of the pituitary gland? A. That's right.

"Q. The secretions, or whatever you might call them, from that gland, regulate the growth of the bony structure of the body? A. That is one of the functions.

"Q. Usually those changes develop during childhood and are reflected in adult life by difference in the bone structure? A. They are born that way.

"Q. They form that way, due to the nature of the function of the pituitary gland? A. That's right.

"Q. And a person who is referred to as acromegalic, has large bones and is usually reflected in their facial contour and contour of the skull? Is that right? A. That's right; that is one of them.

"Q. Was some reference made to prognathous in Dr. Ledbetter's report? A. Well, that is just the base; the sella turcica—a lot of these technical names don't mean much, except it is a deformity of this little thing this gland sits in.

"Q. The sella turcica is where the gland rests? A. Yes, sir.

"Q. Doesn't this woman have a rather prominent chin? A. Acromegaly not only affects the skull, but also the facial bones and the hands at times; but this woman had a very prominent lower jaw.

"Q. All of those indicated that there is evidently some pituitary gland disturbance in her early development? A. That's right.

"Q. Also your report showed that she had a definite thickening of the bones of

the skull; is that right? A. He says 'Moderate general thickening.'

"Q. In other words, the skull, the bones of the skull are somewhat thicker than they would be in the average skull? A. That's right.

\* \* \* \* \* \*

"Q. Whatever disfunction, or abnormal function we will call it, of the pituitary gland takes place, it causes these changes of the bone structure and structure of the skull that take place during the growing up period, the pituitary gland doesn't perform in normal manner, and that as they grow up produces irregular changes in the skull and body formation? A. That's right.

"Q. So that, insofar as the pituitary gland is concerned, any result of gland disturbance as reflected by X-ray pictures and clinical studies, would be something she was born with, is that right? A. That's right."

Dr. Ferguson gave the following testimony respecting the effect which the condition of this pituitary gland might have had upon Charlcie Martin:

"Q. Would a pituitary gland disturbance in a person be calculated to cause restlessness and nervousness? A. It could do it.

\* \* \* \* \* \*

"Q. Would the pituitary gland deformity which you say is indicated by the peculiar formation of that skull, would a person of that kind be more susceptible to injury by a blow on the head than anyone else? A. I think so.

"Q. You say they would? A. I think so.

"Q. From your examination and treatment of Charlcie Martin, would you say that the pain and suffering she has endured since July 17, and the nervousness and dizziness, ear ache and eye pain, is caused from the pituitary gland situation or from the particular blow she received on the head? A. I couldn't tell, but I think that the—that her accident would, or could, produce the symptoms that she has, or make the symptoms worse. She still could have a lot of this stuff originating in this pituitary gland. I can't separate them.

"Q. You do say, however, that she did have more than a usual concussion? A. I think so.

"Q. That would bring on the pain and the symptoms that you testify to? A. Could do it, yes, sir.

"Q. Are those symptoms the regular, recognized symptoms of concussion? A. Yes.

\* \* \* \* \* \*

"Q. Then you say you are unable to separate the symptoms that are due to pituitary gland disturbance and those due to trauma? A. That's right.

"Q. Either one could produce her present symptoms? A. I have never seen her before. I don't know whether she had any symptoms or not. Of course, that lick could produce the symptoms she has. What part the pituitary gland plays in it I don't know."

Reasonably construed, this evidence may be summarized as follows: (1) it tends to show that the pituitary gland in Charlcie Martin's head had not functioned in a normal manner, but that such abnormal characteristics as were exhibited were not at all unusual; that these abnormal characteristics had affected the growth and structure of her skull and perhaps her bony structure generally; and that this condition ordinarily became operative and had effect during the period when the individual was growing up. Since Charlcie Martin was 28 years old at the time of trial (about six months after the accident), her growth period had terminated long before the date of her injury. (2) It also tends to show that by reason of this condition, Charlcie Martin was apt to suffer greater injury from concussion than an ordinary person; that this condition might, or it might not have produced some of Charlcie Martin's complaints; and that the witness could not determine with certainty whether this condition had had this effect or not, although on the whole he was evidently inclined to attribute Charlcie Martin's complaints to the blow on the head.

Point 5 is overruled. Defendant's objection was not good unless there was evidence from which the jury could find that the abnormal characteristics of Charlcie Martin's pituitary gland were in active operation when she was injured; and the evidence does not raise that issue. Charlcie Martin was not suffering from a disease. The peculiar characteristics of the pituitary gland, though not normal, were not calculated to be, and ordinarily would not be operative when Charlcie Martin was hurt,

because it is evident from the foregoing, as well as from evidence referred to below, that said characteristics ordinarily were effective and in operation only during the growth period, and Charlcie Martin's growth period had ended before she was injured. Therefore, proof showing only that such characteristics had existed did not raise the issue that the condition was active. The conclusion of Dr. Ferguson, that he could not determine whether the gland affected Charlcie Martin's symptoms, left his testimony uncertain as to whether the gland had affected her. The jury, of course, could resolve this uncertainty and could determine whether the gland did or did not contribute independently to Charlcie Martin's symptoms, provided they had other evidence on which to act, and such evidence was before them. However, it negatives the idea that the abnormal characteristics of the gland were active when Charlcie Martin was hurt.

■ Charlcie Martin denied any symptom indicating that her pituitary gland troubled her before she was hurt. Although the jury could disbelieve her, they could not make an affirmative finding against her without evidence to support their conclusion; and she is corroborated by such evidence as is relevant. According to other testimony given by her, for which there is support in Ora Gibson's testimony, she was employed by the Missouri Pacific Railway Company when hurt, and had been so employed for about nine months. Her duties required active movement and manual labor and were inconsistent with the symptoms to which she and the physician who had treated her (Dr. Ferguson) testified. She said she cleaned switch signals, helped light switch lamps and saw that they were properly aligned, carried messages and freight bills about the yards and various premises of her employer (when injured she was on her way to her employer's freight house from her employer's yards), carried tools around with her, did quite a bit of walking and lifting, and sometimes drove spikes. She said she had worked regularly and that her wages from Missouri Pacific had averaged $29.40 a week. She had been in Beaumont about two years; prior thereto she had done housework; but said "the most kind of work I have done is farm work." While employed by Missouri Pacific, she was Ora Gibson's "helper," and Ora Gibson said she never heard Charlcie Martin complain of being dizzy and nerv-

ous before the accident. Ora Gibson said that the work was sometimes light and sometimes heavy, and corroborated Charlcie Martin's description of her duties. There was, in addition, medical testimony from Dr. Ferguson and from Dr. Ledbetter showing that Charlcie Martin's symptoms were inconsistent with the performance of her duties as an employee of Missouri Pacific Railway Company and showing that she would have to be in good health to perform these duties.

The Dr. Ledbetter referred to prepared the X-ray report to Dr. Ferguson which is discussed above. He subsequently made another X-ray examination of Charlcie Martin's skull at the request of Dr. Crager, and both he and Dr. Crager testified on trial hereof. The examination for Dr. Ferguson was made on July 17 and that for Dr. Crager was made on December 8. Dr. Ledbetter was perfectly familiar with the result of each examination. The net result of his testimony is that in all probability whatever abnormality existed in the pituitary gland had had full operation and effect while Charlcie Martin was growing up; that he saw no change in the condition between his two examinations; and that the condition was stationary and had existed a long time. As we construe his testimony he thought this condition had nothing to do with the injury "so far as the concussion was concerned." He had seen this condition occasionally and said that it would not necessarily affect Charlcie Martin's health. Dr. Crager testified: "X-ray examination showed a type of skull that we find quite occasionally; people with head a certain shape, forward brow and forward chin and so on. It is thicker than usual, but that, of course, has nothing to do with this injury, and if any effect it would have it would protect the patient against the object. That is, it would be a benefit to a person to have a skull like that if anything fell on your head." It was his opinion that Charlcie Martin had recovered from the effects of the blow on her head.

■ The real issue between the parties was whether Charlcie Martin was injured, and if so, whether she had recovered; and if the record be construed most favorably in defendant's favor, it suggests nothing more than that the blow from the falling pane of glass may have activated certain abnormal characteristics of the pituitary gland and thereby magnified Charlcie Martin's injuries or prolonged same be-

yond the ordinary period of recovery. However, on this showing whatever results the blow had, whatever injuries Charlcie Martin sustained thereby, were directly caused by defendant's negligence and the court properly overruled defendant's objection because there was nothing to exclude from the jury. That Charlcie Martin was apt to suffer greater injury from concussion than an ordinary person would have suffered did not require the court to give the charge requested by defendant. Driess v. Friederick, 73 Tex. 460, 11 S.W. 493. If Charlcie Martin suffered injuries from the activation of abnormal characteristics in her pituitary gland, defendant was liable therefor. Texas & N. O. R. Co. v. Churchill, Tex.Civ.App., 74 S.W.2d 1030. We note that defendant does not attack the judgment on the ground that the jury awarded plaintiff excessive damages.

Defendant assigns error under Point 6 to the action of the trial court in overruling the following objection to Special Issue 9: "Such issue invites and permits the jury to assess double damages and excessive damages in that it allows and invites them to consider separately, items and things which properly constitute but one element of recovery, and to allow separate assessment of damages for effects and conditions for which only one award can be made, in that the physical pain inquired about is the cause of any loss of earning capacity, and results therefrom, so that to allow one award for such pain and another for the loss of earning capacity resulting therefrom would allow an excessive recovery."

Special Issue 9 reads as follows:

"From a preponderance of the evidence, what sum of money, if any, if paid now in cash, do you find would fairly and reasonably compensate the plaintiff Sam Earnest Martin for such damages as you may find he has sustained or will in reasonable probability sustain in the future, as a direct result of Charlcie Martin's being struck, if she was struck, by a pane of glass falling from the upper row of windows of defendant's building and striking her, taking into consideration the following elements, and none other:

"(a) Such physical pain, if any, as you may find from the preponderance of the evidence she has sustained from the date of her injury to the date of this trial;

"(b) Such physical pain, if any, as you may find from the preponderance of the evidence she will in reasonable probability sustain in the future beyond this date;

"(c) The reasonable cash value of such diminished earning capacity, if any, as you may find from the preponderance of the evidence she has sustained or will sustain in reasonable probability as a direct consequence of the injuries, if any, suffered by her.

"(d) Such sum of money, if any, as you find from the preponderance of the evidence to be the reasonable value of such necessary medical and hospital services and medicines furnished to said Charlcie Martin in connection with the treatment of such injuries, if any, as she sustained on the occasion in question.

"Answer by stating the amount, if any, in dollars and cents."

The trial court properly overruled this objection. Issue 9 is in the customary form. Properly construed it neither requires nor permits a verdict for double damages; the explanatory instruction which was a part of Special Issue 9 referred all elements back to the blow on Charlcie Martin's head and did not base loss of earning capacity on pain and suffering. The elements of damage listed in said instruction have been consistently treated as independent. We overrule Point 6 on authority of the following decisions, namely: Lyon v. Bedgood, 54 Tex.Civ.App. 19, 117 S.W. 897; Houston Electric Co. v. Seegar, 54 Tex.Civ.App. 255, 117 S.W. 900; Receivers of Kirby Lbr. Co. v. Lloyd, 59 Tex. Civ.App. 489, 126 S.W. 319; Houston & T. C. R. Co. v. Maxwell, 61 Tex.Civ.App. 80, 128 S.W. 160; Missouri, K. & T. Ry. Co. v. Aycock, Tex.Civ.App., 135 S.W. 198; Louisiana Ry. & Nav. Co. v. Eldridge, Tex. Civ.App., 293 S.W. 901; International & G. N. R. Co. v. Wray, 43 Tex.Civ.App. 380, 96 S.W. 74; Galveston, H. & S. A. Ry. Co. v. Fink, 44 Tex.Civ.App. 544, 99 S.W. 204; Texas & N. O. R. Co. v. Middleton, 46 Tex. Civ.App. 497, 103 S.W. 203; Industrial Lbr. Co. v. Bivens, 47 Tex.Civ.App. 396, 105 S.W.831; El Paso Electric Co. v. Buck, Tex.Civ.App. 143 S.W.2d 438; Texas Cities Gas Co. v. Dickens, Tex.Civ.App., 156 S.W.2d 1010, affirmed, 140 Tex. 433, 168 S.W.2d 208; St. Louis S. W. Ry. Co. v. Swilling, Tex.Civ.App., 143 S.W. 696.

This disposes of all matters assigned as error. No error appearing, the judgment of the trial court is affirmed.