A. T. COLLINS et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 78–3125.

United States Court of Appeals,
Sixth Circuit.

Argued April 8, 1980.

Decided May 22, 1980.

Charles A. Williams, Williams, Housman & Sparks, Paducah, Ky., for plaintiffs-appellants.

Patrick H. Molloy, U. S. Atty., Lexington, Ky., James P. Klapps, Asst. Chief, Torts Section Civil Div., U. S. Dept. of Justice, Washington, D. C., I. Avrum Fingeret, Asst. Sol., U. S. Dept. of Interior, Arlington, Va., Wm. Kanter, Neil H. Koslowe, John F. Cordes, Dept. of Justice, Civil Div., App. Section, Washington, D. C., for U. S.

Before CELEBREZZE and BROWN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

HARRY PHILLIPS, Senior Circuit Judge.

This action grows out of a tragic explosion in a coal mine near Hyden, Leslie County, Kentucky, on December 30, 1970. Suit for money damages was filed against the United States by appellant A. T. Collins, who was injured in the explosion, and by the personal representatives of 25 coal miners who were killed in the disaster.

Jurisdiction was asserted under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. The complaint charged that the proximate cause of the injuries and deaths of the miners was the failure of the United States to inspect the mine in accordance with the requirements of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 801 et seq.

District Judge H. David Hermansdorfer, sitting without a jury, held that the plaintiffs did not establish that the failure of the Government to inspect the mine was a proximate cause of the injury and deaths.

The district judge further found that unforeseeable superseding and intervening negligent acts of the coal mine operators would have prevented recovery by the plaintiffs even if proximate cause had been established. We affirm on the ground that the findings of fact of the district judge are not clearly erroneous. Fed.R.Civ.P. 52(a).

The Government contended in the district court and on this appeal that the United States cannot be held liable for money damages under the Federal Tort Claims Act on the basis of allegedly improper or incomplete mine safety inspections conducted pursuant to federal coal mine safety legislation. The district court held that an action lies under the Federal Tort Claims Act under the averments of the complaint in this case. We expressly reserve a decision on that question and express no views thereon in this opinion. The issue of whether an action lies under the Federal Tort Claims Act under a similar factual situation will be presented squarely to this court in pending case No. 80–3033, in which the Government has appealed from the decision of the district court in *Raymer, Administratrix v. United States* and *Gill, Administratrix v. United States*, 455 F.Supp. 165 (W.D.Ky. 1978).

I

On March 30, 1970, the Federal Mine Health & Safety Act of 1969 (the 1969 Act) became law.[1] In the spring of 1970, the Finley Coal Company opened two new mines, Nos. 15 and 16, near Hyden, Leslie County, Kentucky. Later that year, the two mines were interconnected and operated as one mine.

The primary concern of the 1969 Act is for the health and safety of miners. 30 U.S.C. § 801(a). The Secretary of Health, Education and Welfare and the Secretary of the Interior were directed to develop and promulgate improved mandatory health and safety standards to protect coal miners; to compel coal mine operators' compliance

1. The 1969 Act was superseded by the Federal Mine Safety and Health Amendments Act of 1977. References in this opinion are to the 1969 Act, which was in effect at all times relevant to this litigation.

with the standards; to work with the states for such purpose; and to develop research and training programs with the states and the industry aimed at preventing coal mine accidents and occupational diseases. 30 U.S.C. § 801(g).

30 U.S.C. § 801(e) provides:

[T]he operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines.

Representatives of the Government are required to inspect and investigate coal mines each year for the purpose of acquiring and disseminating information relating to health and safety conditions, and the causes of accidents, diseases and physical impairments originating in the mines; gathering information with respect to mandatory health and safety standards; determining whether an imminent danger exists; and determining whether there is compliance with the mandatory health or safety requirements. The Government representatives are required to inspect each underground coal mine, in its entirety, "at least four times a year." 30 U.S.C. § 813(a).

The 1969 Act also establishes certain interim mandatory health or safety standards. The health standards, in part, involve dust control, respiratory equipment, and medical examinations. 30 U.S.C. §§ 841 et seq. The safety standards involve roof supports, ventilation, combustible materials, explosives and similar matters. 30 U.S.C. §§ 861 et seq.

Particularly important to this litigation are the safety standards relating to combustible materials and "rock dusting", 30 U.S.C. § 864(d), and "permissible explosives" and "shot firing units", 30 U.S.C. § 873(c). Section 864(d) requires mine operators to "rock dust" all underground areas of a mine so that combustible coal dust is diluted with inert dust so that the amount of incombustible dust constitutes no less than 65 per cent of all dust present and no less than 80 per cent in return air-courses. Section 873(c) calls for the use of permissible explosives, detonators and blasting de-

vices. It requires that explosives be fired only with permissible shot firing units and that incombustible materials be used for stemming boreholes.

II

During the period from June 19, 1970, through December 21, 1970, inspectors from the Mine Enforcement and Safety Administration (MESA), Bureau of the Mines, Department of the Interior, visited and inspected mines 15 and 16. The district court found that MESA failed to comply with its statutory duty of making four complete inspections of the mines per year and that there had been one complete and one spot inspection of mine 16 and six spot inspections of mine 15. Those inspections had uncovered various violations of mine safety which were ordered abated and subsequently corrected.

At 12:20 p. m. on Wednesday, December 30, 1970, unusually large aggregate amounts of explosives were detonated in mine 16 where a new boom hole was being created. The shock wave of displaced air lifted combustible coal dust into suspension. The coal dust ignited and the ensuing explosion propagated into mine 15. All of the 39 men underground were killed instantly except for appellant Collins, who was injured while in the entry of mine 15.

The plaintiffs, having been denied their administrative claims, filed suit against the United States attributing the explosion to negligent inspection and enforcement of the 1969 Act and sought damages under the Federal Tort Claims Act.

In his memorandum opinion filed November 30, 1977, District Judge Hermansdorfer set forth the following summary of his findings concerning the explosion.

"On the morning of December 30, 1970 work was begun to establish, by blasting, a loading or transfer point in Finley Mine 16 at entry 6, 1 left. A roof bolting machine was used to drill about one hundred and twenty (120) 'shot' holes, each having a diameter of four (4") inches and extending into the roof material about thirty (30")

inches. The area so drilled was eighteen (18') feet long by twenty-eight (28') feet wide. Permissible explosives were inserted into the holes and stemmed by paper. The aggregate amount of dynamite used was unusually large. Primacord, a high explosive not permissible underground, was used as the igniter and it was detonated by 'either a shot firing unit, power cable, or to the battery connections of a nearby battery-powered tractor' [Plaintiffs' Exhibit 5, p. 16]. The resulting shock wave of displaced air lifted coal dust into suspension in an explosive concentration, and the explosion occurred when the coal dust was ignited.

"To state a claim for actionable negligence under Kentucky common law, plaintiffs must show, by a preponderance of the evidence, that the United States owed a duty to persons including the plaintiffs, that such duty was breached under circumstances where it was reasonably foreseeable that such breach, in this case by omission, could pose a risk of injury or death to plaintiffs, and that such foreseeable consequences did result as a natural and probable consequence of such negligence. See *Spivey v. Sheeler*, Ky., 514 S.W.2d 667 (1974); *Glasgow Realty Company v. Metcalfe*, Ky., 482 S.W.2d 750 (1972).

"Plaintiffs' theory of liability, as asserted in post-trial brief, argues that MESA's failure to properly discharge its duties of inspection permitted the accumulation of inadequately inerted coal dust and that such dust propagated the explosion throughout Mines 15 and 16 where, if such coal dust had been properly inerted, the explosion would have been a localized occurrence. However, under the Act the operator of the mine is charged with the 'primary affirmative responsibility to prevent the existence of such [unsafe] conditions and practices . . .', 30 U.S.C. § 801(e). It necessarily follows that to be liable under Kentucky law, MESA would have to have known or be charged with knowledge that the operator would not obey the duties imposed upon him under the Act as measured by what an ordinarily prudent person in the same or a similar situation would have known or be charged with knowing. *Bowlin v. General Tire & Rubber Co.*, Ky., 445 S.W.2d 693, 695 (1969).

"Plaintiffs have established that MESA failed to comply with its statutory duty of making four (4) complete inspections of the Finley mine per year. Mines 15 and 16 were opened, respectively, in March and June of 1970 [Plaintiffs' Exhibit 5, p. 3]. During this period, MESA made only one complete inspection of Mine 16 on October 19, 20–22, 1970, and one spot inspection of the same mine on October 26, 1970. Mine 15 was never completely inspected, but during the nine (9) month period between its opening and the December 30 explosion, MESA conducted six (6) spot inspections. Nevertheless, these inspections may not stand for substantial compliance with the requirement of complete inspections. From these inspections, a total of forty-three (43) notices or citations for violations of the Act's health and safety standards were issued to the operator by MESA inspectors [Plaintiffs' Exhibit 5, App. F]. From those citations pertaining to coal dust, plaintiffs argue that MESA was put on notice that the mine contained such 'excessive' quantities of coal dust that the conditions in the Finley mines constituted 'an explosion waiting to happen'.

"In Kentucky one may infer, without an evidentiary basis, that MESA knew or should have known that inadequately inerted coal dust would be present in the Finley mines at any given time.[2] Plaintiffs

[2] *Bowlin, supra* at 695. Plaintiffs have the burden of presenting such evidence.

presented evidence showing that on November 19, 1970, the last spot inspection of Mine 15 before the explosion, rock dusting was found to be adequate [Plaintiffs' Exhibit 5, p. 9]; 'in accordance with Bureau procedures, the adequacy of rock dust applications was determined visually' [*Id.*]. A portable rock dusting machine was present in the mines, and when inoperable, rock dusting was performed by hand by a nine (9) man maintenance crew [*Id.* at 9, 10]. In the inspections of August 14 and October 19–20 and 22, 1970, inadequate rock dusting

violations were cited [Act, § 304(b), 30 U.S.C. § 864(b)], but all violations were timely abated [Plaintiffs' Exhibit 5, App. F].

"There is evidence that on the day of the explosion, the men working underground were engaged in the mining of coal. From this fact, it may be inferred that coal dust was produced as a by-product of the mining operation. However, it requires further circumstantial evidence to infer that the amount of coal dust was excessive or that it was inadequately inerted.

"Plaintiffs' evidence reveals that the normal business at the Finley mines was conducted by two mining shifts and one maintenance shift. The average daily production was fifteen hundred (1500) tons of coal [Plaintiffs' Exhibit 5, p. 2]. Rock dusting operations were performed by the maintenance crew on the last shift of each day. Each morning then began with a production shift [*Id.*, App. F]. Thus, one may infer from such past practice that it is more probable than not that the mine was rock dusted on the morning of December 30, 1970. The Fire Boss' book was not introduced into evidence, although it is the record diary of a coal operator as to what was actually done, by shift, underground. KRS 352.380 and 352.290. See also 30 C.F.R. § 75.1800 *et seq.*

"The foreseeability test employed in Kentucky, in terms of a negligently created condition, fixes liability for those consequences which 'might and ought to be foreseen by the wrongdoer as likely to flow from his act'. *Spivey v. Sheeler, supra.* From the foregoing evidence, I find no basis on which to conclude that MESA's failure to perform the required number of inspections of the Finley mines resulted in the existence of excessive coal dust on the date of the explosion, nor does the evidence permit the inference that MESA should have foreseen the existence of allegedly excessive and inadequately inerted coal dust in the mine on December 30, 1970.

"It appears to be plaintiffs' argument that the desired conclusion of excessive coal dust is justified by the fact of the explosion

*per se,* under the rationale that if there had not been excessive coal dust in the mine, the explosion would not have occurred or would have been localized. The evidence does not permit such a simple answer to the problem. The concept of 'excessive amounts of dust' was defined by regulation [30 C.F.R. 75–400–1][3] as 'coal and float

[3] This regulation has been held invalid, *United States v. Finley Coal Co.,* 493 F.2d 285, 291 (6th Cir. 1974), cert. denied 419 U.S. 1089, 95 S.Ct. 679, 42 L.Ed.2d 681 (1974).

dust *in the air* in such amounts as to create the potential of an explosion hazard' [emphasis added]. The Coal Mine Inspector's Manual, edition of August 1969 [Plaintiffs' Exhibit 9] does not address the question of excessive coal dust directly but rather the adequacy of inerted coal dust in terms of 'observable inadequately inerted coal dust' [*Id.* at p. 51]. The manual goes no further. By evidence it is shown that the industry standard as to excessive coal dust at the time was in terms of that amount of coal dust in the air which would prevent one from seeing the light from a cap lamp eight (8) feet away [Tr. E., Vol. * * *, at 573]. The issues with respect to coal dust bottom out on two basic considerations: (1) the amount of coal dust in the air in such quantity as to be deemed excessive, and (2) the adequacy of inerting coal dust on all surfaces of the underground mine which is measured by observation, or, by turning such surfaces white by application of rock dust.

"The evidence establishes without contradiction that $5/100$ of an ounce of coal dust per cubic foot of air will support combustion [Tr. E., Vol. III, at 555]. This comports with the regulation standard, *supra,* but makes use of the word 'excessive' somewhat difficult to understand. The word 'excessive' by custom and practice of the industry relates to a cloud of dust so dense that it obscures light from a cap lamp at eight (8') feet. This standard simply does not relate to explosion potential. Going further, the evidence shows that the government's expert witness, Donald W. Mitchell, actually used a vacuum cleaner on a portion of a different mine and after it was cleaned

found sufficient quantities of residual coal dust to propagate an explosion [Tr. E., Vol. III, at 559]. In terms of applying labels, one would have to conclude that the vacuumed mine contained 'excessive' amounts of coal dust where 'excessive' describes that quantity of coal dust creating the potential of explosion. By parity of reasoning, every coal mine in which coal has been mined would contain an excessive amount of coal dust as a matter of probability. Thus plaintiffs' unquantified standard, 'excessive', has no substantial meaning under the evidence presented in this case.

"The invalidated federal standard for inerting coal dust required that at least sixty-five (65%) percent inert material, typically lime-stone rock dust, be applied. 30 C.F.R. § 75.403. However, as noted previously, MESA inspectors determined the adequacy of rock dusting by visual examination [Plaintiffs' Exhibit 9, p. 52]. Had MESA made timely inspections of the Finley mines and cited the operator for dust violations, such violations simply would be abated by the application of adequately inerting quantities of rock dust. 30 U.S.C. § 864; 30 C.F.R. § 75.403.

"Notwithstanding the above standards, the experts in this action agree that conditions in an underground mine are dynamic [Dr. Sinha, Tr. E., Vol. II, at 216; Mr. Mitchell, Tr. E., Vol. IV, at 597]. The amount of coal production appears to be related to the generation of coal dust [Mitchell, Tr. E., Vol. IV, at 598–599]. The Act of abating coal dust with the application of rock dust at one point in time does not preclude an unsafe condition arising shortly thereafter from subsequently generated coal dust. The evidence does not suggest when MESA should have inspected the mines if it had complied with the requirements of Section 813(a) of the Act [sic]; such inspections under the evidence of this case are material to underground mine conditions only at the time they are made and quickly lose any safety significance because of the dynamic conditions of underground mining. Thus, at the outer limit MESA personnel could be chargeable only with foreseeing those circumstances arising with-

in a reasonable time after such inspection. For the reasons which follow, I find that MESA inspectors cannot be held to have reasonably anticipated the actions of the operator of the Finley mine which precipitated the explosion of December 30, 1970, or the equally unreasonable act of the operator in permitting men underground at a time when an impermissible ignition of high explosives was initiated [see Plaintiffs' Exhibit 5, p. 25].

"The shooting of a boom hole in an underground mine is an ordinary and recurring aspect of coal mining. However, there is no evidence tending to show that the boom hole blasting activities of December 30, 1970 could be described as ordinary or typical. The abnormal aspects of the procedures include the excessive quantity of permissible explosives employed, the impermissible use of paper stemming, the failure to have sequential firing where a substantial amount of powder is involved and the use of an impermissible high explosive as the igniter of the permissible explosives. I find no evidence that any of these aspects of the explosion sequence were foreseeable by MESA; they are clearly beyond the ambit of dynamic occurrences inherent in the Finley mines. Accordingly, I am convinced by the evidence and all of the circumstances of this case that but for the use of primacord in conjunction with excessive amounts of dynamite, the explosion complained of would not have occurred. I find no evidence tending to support the proposition that such an explosion would have occurred had approved procedures and proper explosives been used to shoot the boom hole.

"Although it is not known how much coal dust was present before the explosion (and I find no basis to support any inference other than one finding that at least the minimum explosive concentration of $5/100$ of an ounce of coal dust per cubic foot of air was present), there is simply no evidence that such coal dust was present in excessive amounts as that term is used within the mining industry. It is not known nor can one infer from the evidence that the coal dust was in fact adequately rock dusted at

the beginning of the morning production shift on December 30, 1970 but MESA's post-accident investigation revealed that some rock dust had been applied in the area where the explosion originated [Plaintiffs' Exhibit 5, pp. 20, 21]. Nevertheless, under the evidence I find that the explosion would have occurred even if the coal dust present in the mine had been adequately inerted. The reasons for this conclusion are more fully discussed in the Appendix, but it may be stated here that the high velocity of air displaced by detonation of the particular explosive materials employed would necessarily have created a shock wave of sufficient speed and force to have brought adequately inerted coal dust into airborne suspension at a particle velocity sufficient to sustain combustion, and the resulting high temperatures, measured in several thousand degrees Kelvin[4], were sufficient to ignite

[4] Kelvin refers to an absolute temperature scale in which zero Kelvin is equivalent to − 372°C; the freezing point of water is 273°K and the boiling point of water is 373°K.

such airborne coal dust. This clearly would not have been the circumstance attending the weaker ignition sources normally used in shooting boom holes in a permissible manner in an underground coal mine.

"I can find no basis upon which to conclude that MESA inspectors knew or should have known of the wholly irregular practices employed underground at the Finley mines on December 30, 1970.[5] The presence

[5] The parties have stipulated, Tr. E., Vol. IV., at 678, that MESA inspectors never found any primacord underground prior to the explosion."

of primacord above ground will not support an inference that it was being used underground [Tr. E., Vol. III, at 545]. All witnesses agree that primacord should not be used in an underground coal mine [Tr. E., Vol. II, at 140; Vol. III, at 544–546]. Even if one should conclude, arguendo, that MESA's failure to inspect was somehow causally connected with the explosion, the abnormal and impermissible practices of the operator were such as to constitute unforeseeable acts of intervening negligence which superseded any negligence of the MESA inspectors. *Hall v. Midwest Bottled*

*Gas Distributors, Inc.,* Ky., 532 S.W.2d 449 (1975); *Lexington Country Club v. Stevenson,* Ky., 390 S.W.2d 137, 141 (1965); see also *House v. Kellerman,* Ky., 519 S.W.2d 390 (1975).

Judge Hermansdorfer attached to his memorandum opinion an appendix setting forth his findings of fact in greater detail. The appendix to the memorandum of the district court is made an appendix to this opinion.

We have reviewed the record in this cause in its entirety and with great care, due to the technical nature of the problems and the significant effect our decision will have on the principals involved in this mine disaster. The record is clear and speaks for itself. The factual determinations of the district court are not clearly erroneous. Assuming *arguendo* that the inspectors from MESA were culpably negligent in their failure to inspect mines 15 and 16, the findings of the district court are clearly correct that the procedures employed by the coal mine operator on the day of the accident constituted such unforeseeable superseding and intervening acts of negligence as to remove any causal connection between the failure to inspect and the injury and deaths of the miners.

The decision of the district court is affirmed on the basis of the findings of fact of the district judge. As heretofore stated, this court in this opinion expresses no views with respect to the contention of the Government that there is no cause of action under the Federal Tort Claims Act. No costs are taxed. The parties will bear their own costs on this appeal.

### APPENDIX

This Appendix is a further statement and analysis of the fact finding responsibility of the Court and is limited to the more technical aspects of the evidence. All of the evidence has been carefully reviewed and the data discussed below are derived principally from the Official Report of Major Mine Explosion Disaster [Plaintiffs' Exhibit 5]; the testimony of Donald William Mitchell, Chief of MESA's Approval and Certifi-

cation Center and the testimony of Dr. Atmesh Kumar Sinha, Associate Professor, Mining Engineering, Southern Illinois University. My primary areas of concern are to determine the sequential step mechanics of the explosion in terms of the differences between what would have occurred if excessive permissible explosives and primacord had not been used and what did occur employing those explosives. Such detailed analysis is deemed appropriate in terms of what I understand plaintiffs' argument under *Johnson v. Kosmos Portland Cement Co.*, 64 F.2d 193 (6th Cir. 1933), to be, namely, that an explosion was a foreseeable result even though the cause of the explosion was not. Although *Johnson* is clearly distinguishable on its facts, the proposition is worthy of attention.

There is no dispute among the expert witnesses that circumstances in an underground coal mine should be described as dynamic. This imports conditions subject to change, sometimes in small time frames. The value of any underground coal mine inspection is, therefore, limited to the conditions which exist at or about the time of the inspection. It appears to be the thrust of the mandatory safety standards promulgated under the requirements of the Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 *et seq.* to circumscribe known impairments to safety by federal law, or, in other words, to control aspects of such dynamic conditions. Other limitations on the dynamic conditions of an underground mine may be derived from knowledge of the mine itself. In the case of Finley Coal Company Mines 15 and 16, it is known that they were classified as "non-gassy" which eliminates methane gas as a significant factor in the mining operation, although methane had been detected [Plaintiffs' Exhibit 5, pp. 2, 20]. Another factor material to the dynamic conditions of the Finley mines is the volatile ratio of the coal being mined. "Numerous tests by the Bureau of Mines have shown that coal dust having a volatile ratio of 0.12 and higher is explosive. The volatile ratio of the coal in these mines is 0.42, indicating that the coal dust is highly explosive" [*Id.* at p. 3]. However, the vola-

tile ratio of Finley coal, standing alone, is not of much assistance in understanding the mechanics of the explosion of December 30, 1970. The volatile ratio does not, for instance, significantly affect the minimum explosive concentration in terms of particle size. Minimum explosive concentration of particles, by size, does not alter the requirement of an air velocity of one hundred and fifty (150') feet per second among the particles for explosive concentration [Mitchell, Tr. E., Vol. III, at 510–511, 563]. However, given the minimal physical conditions necessary for ignition, the volatile ratio does relate to increased probabilities for an explosion as opposed to burning of such coal dust. In short, the volatile ratio becomes significant when an explosive concentration of coal dust is raised into airborne suspension at the requisite particle velocity to support combustion. The greater the volatile ratio, the more combustible the coal dust and, hence, a greater amount of rock dusting material is required to adequately inert the coal dust present in the Finley mines, in terms of foreseeable permissible ignition sources.

The experts agree that the quantity of air displaced by falling rock from a boom hole the size of the one shot on December 30, 1970 in Mine 16, entry 6, 1 left, would have been, excluding the forces of any explosives used, one thousand two hundred and sixty (1260) cubic feet [Mitchell, Vol. III, at 516; Sinha, Vol. I, at 182]. The speed and force of such displaced air, without consideration of explosive forces, would have been on the order of a velocity of five (5') feet per second with a force of 1/100 of a pound per square inch [psi], assuming a one hundred and eighty degree (180°) plane or direction as opposed to a lesser force dissipating on a three hundred and sixty degree (360°) plane. Since a coal mine does not present an unrestricted area for the dissipation of energy involved in displaced air, the value of 1/100 psi is reasonable [Tr. E., Vol. III, at 518, 520]. Forces of this magnitude have the capability of raising into suspension small amounts of dust within three (3') to ten (10') feet of the falling rock, but would not be capable of maintaining dust in

suspension [*Id.* at 521]. This dust, of course, could come from the roof, sides or floor of the mine.

Adequately inerted coal dust would be covered by a superficial layer of inert material. The feeble forces associated with falling rock from a boom hole possibly could disturb the outer layer of rock dust or, if uninerted, coal dust, but could not keep it in suspension [*Id.* at 522]. Given the factors of a wave front with a velocity of five (5') feet per second and a force of $\frac{1}{100}$ psi, the necessary forces to raise an explosive concentration of coal dust with the necessary particle velocity are not shown. Further, the exposure to ignition would be about $\frac{3}{10}$'s of one millisecond from permissible explosives simultaneously detonated [*Id.* at 564]. There is simply no evidence that forces involved in the displacement of one thousand two hundred and sixty (1260) cubic feet of air and the predictable ignition source from permissible explosives could have ignited uninerted coal dust regardless of its volatile ratio. There is a total absence of any basis from which to infer that the explosion would have occurred under normal mining practices.

I conclude that the circumstances in the Finley mines on the morning of December 30, 1970 did not amount, in plaintiffs' terms, to "an explosion waiting to happen". A boom hole could have been shot permissibly without the occurrence of an explosion [*Id.* at 566]. Of course, good mining practice would require that no one be underground during detonation except a certified shot firer [*Id.* at 538–539]. 30 C.F.R. § 15.24(b), number 14. In the history of the Finley mine, blasting was normally done during the thirty (30) minute interval between shifts when there were no men working underground [Plaintiffs' Exhibit 5, p. 7], although there was no testimony before MESA, of on-shift detonations [Plaintiffs' Exhibit 4, pp. 44, 48, 49, 50, 53]. Since boom holes are necessary to the business of underground mining and act as transfer or loading points for coal from the mine face for transportation to the surface [Tr. E., Vol. IV, at 623], the boom hole shot on December 30, 1970 was not the first boom hole in the Finley mines [Plaintiffs' Exhibit 5, p. 15]. There is evidence of coal being shot on shift in a proper manner [*Id.* App. F]. Considering the evidence of other detonations of explosives underground at the Finley mines without uncontrolled propagation by ignition of coal dust, it is apparent that the volatile ratio factor standing alone has limited relevance to the cause of the explosion. Subsequent experimentation with Finley coal dust confirms this finding. Coal dust from the Finley mines was predispersed in a controlled atmosphere in precise amounts [0.3 oz/cu ft], a quantity about six (6) times the minimum concentration established by testing to be explosive. Two detonations of three (3) sticks of dynamite each were made, stemmed and unstemmed, in a cannon with the result that no ignitions of the coal dust occurred. These tests simulated shot hole detonations. One (1) stick of dynamite openly detonated in this explosive concentration atmosphere did ignite the coal dust [*Id.* App. H].

The evidence which does explain the explosion is clear and convincing. It first appears that an excessive amount of permissible explosives were positioned for detonation without regard for approved practices [Tr. E., Vol. III, at 531, 537–541]. I find that at least one hundred and twenty (120) pounds of dynamite were involved in shooting the boom hole on December 30, 1970 [*Id.* at 530]. These explosives were stemmed with paper, a separate impermissible practice [*Id.* at 564], which presents the hazard of a longer lived source of open flame upon ignition [*Id.* at 565]. These explosives were "fused" with primacord to detonate simultaneously [Tr. E., Vol. III, at 552–553]. Primacord is the trade name of a particular brand of high explosive which by common usage has evolved into a generic term for all high explosives of the class appearing in physical form as a cord like substance. Primacord detonates rather than deflagrates—it explodes rather than burns. Upon ignition the detonating velocity of primacord is about twenty thousand (20,000') feet per second, and the resulting

forces are not subject to reasonable control. [*Id.* at 543–545].

Returning to the uncontroverted evidence of the physical requirement of particle velocity as a requisite for any coal dust explosion, the energy source capable of initiating an air velocity of one hundred and fifty (150′) feet per second among particles needs to be identified. Although no witness attempted to calculate precisely the combined forces resulting from the simultaneous detonations of primacord and one hundred and twenty (120) pounds of explosives, I find that such forces were sufficient to bring the coal dust into suspension, whether inerted or not, and to propel the dust particles past the threshold of requisite explosive particle velocity. At this juncture, the volatile ratio of the coal dust negated the probability of burning and insured to an almost certainty an explosion upon ignition. The igniting source I find to be the very hot gases associated with the detonation of primacord which have been measured in several thousand degrees Kelvin. In confrontation with such forces normal rock dusting would be totally ineffective. The forces attending the explosion were strong enough to blow out concrete stoppings [Plaintiffs' Exhibit 5, at 22] and the ignition source was at least ten (10) times greater than that required for predictable ignition in terms of temperatures. By testing MESA has determined that in extreme circumstances coal dust inerted to ninety-three (93%) percent was inefficient in arresting the propagation of .flame [Tr. E., Vol. III, at 560].

The technical evidence convinces me that those practices employed by the operators of the Finley mines on December 30, 1970 were totally inconsistent with any reasonable standards applicable to the use of explosives in an underground coal mine. I find no evidence upon which to find or infer that MESA could or should have known that by its failure to complete the four (4) mandatory inspections required by the Act, the mine operators would have abandoned good mining practices and employed the inexcusable practices described in the evidence.